## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

AARON SHAW
281 Davis Avenue
Philadelphia, PA

And

ROBERT LACOURT
30 Hawthorne Avenue
Newark, DE

                **Plaintiffs,**

v.

TEMPLE UNIVERSITY
1801 North. Broad Street,
Philadelphia, PA

DENISE WILHELM (Captain/Deputy Director)
EDWARD WOLTEMATE (Captain)
CHARLES JAMES (Sergeant)
BRIAN CRAWFORD (Corporal)
JUSTIN BUSAM (Patrol Officer)
1801 North 11th Street
Philadelphia, PA

                **Defendants.**

Civil Action No.: -

**JURY TRIAL DEMANDED**

## COMPLAINT

Aaron Shaw and Robert LaCourt, hereinafter collectively referred to as "Plaintiffs", by

and through their attorneys, FELLHEIMER & EICHEN LLP, bring this action against Defendants

seeking damages for i) violation of Plaintiffs' civil rights under Section 1981 of the Civil Rights

Act of 1964, 42 U.S.C.A. §1981 ("Section 1981") arising from Defendants' intentional racial

discrimination and retaliation against Plaintiffs; and ii) under 42 U.S.C. § 1983 for depriving

1

Plaintiffs their rights to Freedom of Speech, Equal Protection Rights, and Due Process of law as provided in the First Amendment and Fourteenth Amendments of the United States Constitution:

## PARTIES

1.       Plaintiff Aaron Shaw ("**Officer Shaw**") is an African American individual residing at 281 Davis Avenue, Philadelphia, PA.  From November of 2003 until August of 2016, Officer Shaw was employed by Defendant Temple University (**"Temple University"**) in its Department of Campus Safety Services as a patrol officer.

2.       Plaintiff Robert LaCourt ("**Officer LaCourt**") is a Hispanic individual residing at 30 Hawthorne Avenue, Newark Delaware.  From 2010 to August of 2016, Officer LaCourt was employed by Temple University in its Department of Campus Safety Services ("Temple Police") as a patrol officer.

3.       Defendant Temple University is a private state-related university with its principal place of business at 1801 North Broad Street, Philadelphia, PA containing the Department of Campus Safety Services, (**"Temple Police"**) which operates under the supervision and control of Temple University (**"Temple University"**).

4.       Defendant Denise Wilhelm ("**Captain/Deputy Wilhelm"**) is an individual employed by the Temple Police with a place of business at 1801 North 11th Street, Philadelphia, PA.  At all various times relevant to this Complaint, Captain/Deputy Wilhelm held the rank of Captain and later Deputy Director with the Temple Police.

5.       Defendant Edward Woltemate ("**Captain Woltemate**") is an individual employed by the Temple Police with a place of business at 1801 North 11th Street, Philadelphia, PA.  At all times relevant to this Complaint, Captain Woltemate held the rank of Captain with the Temple Police.

2

6.      Defendant Charles James ("**Sergeant James**") is an individual employed by the Temple Police with a place of business at 1801 North 11th Street, Philadelphia, PA.  At all times relevant to this Complaint, Sergeant James held the rank of Sergeant with the Temple Police.

7.      Defendant Brian Crawford ("**Corporal Crawford**") is an individual employed by the Temple Police with a place of business at 1801 North 11th Street, Philadelphia, PA.  At all times relevant to this Complaint, Corporal James held the rank of Corporal with the Temple Police.

8.      Defendant Justin Busam ("**Officer Busam**") is an individual employed by the Temple Police with a place of business at 1801 North 11th Street, Philadelphia, PA. At all times relevant to this Complaint, Officer Busam was employed by Temple Police as a patrol officer.

## JURISDICTION & VENUE

9.      This Court has original jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1341 as these claims arise under (a) the Constitution of the United States and (b) 42 U.S.C. §§ 1981(a), 1983, and 1988.  Moreover, this Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over the state claims for fraud arising from and related to the claims being brought under 42 U.S.C. §1983.

10.     Venue is properly in this Court 28 U.S.C.A. §1391(b) because a substantial part of the events or omissions giving rise to the claims herein occurred in the Eastern District of Pennsylvania.

11.     Temple University is a state actor for the purpose of 42 U.S.C.A Section 1983 because Temple University alleges that each of its police officers are "Pennsylvania - certified law enforcement officers ---- authorized to enforce the law and make arrests similar to any municipal police force:

3

## FACTS

12.      One of the departments within Temple University is the Department of Campus

Safety Services, a full service police and security organization that provides 24-hour safety and

security services to Temple University's campuses. (**"Temple Police"**)

13.      According to the 2016 ANNUAL SECURITY AND ANNUAL FIRE SAFETY

REPORT, page 3, ("2016 Security Report") published by Temple University, *"Temple Police is*

*currently made up of over 130 Temple Police officers (including supervisors and detectives)*

*patrolling area campuses. Each officer is a Pennsylvania-certified law enforcement officer who*

*has received state-mandated police recruit training at an accredited police academy and is*

*authorized to enforce the law and make arrests similar to any municipal police department*

*officer."* (The 2016 Annual Security and Annual Fire Safety Report is attached as Exhibit "**A**")

14.      The Temple Police reporting hierarchy (from lowest to highest) is:

     a.  Patrol Officer

     b.  Corporal

     c.  Sergeant

     d.  Lieutenant

     e.  Captain

     f.  Operations Manager

     g.  Deputy Director

     h.  Executive Director

15.      Some police officers having the rank of Captain, have supervisory responsibility

over other police officers of the same rank.  While holding the rank of Captain, Captain/Deputy

Wilhelm had supervising responsibilities over certain aspects of Captain Woltemate's duties.

4

16. The Temple Police assigns patrol officers to one of three 8-hour shifts:

    a.  the first shift from 7:00 a.m. to 3:00 p.m. ("**First Shift**");

    b.  the second shift from 3:00 p.m. to 11:00 p.m. ("**Second Shift**"); and

    c.  the last shift from 11:00 p.m. to 7:00 a.m. ("**Last Shift**").

17.    At the start of each shift, the patrol officers meet with the officer in charge ("**Shift Supervisor**") in a daily meeting called "**Roll Call**".

18.    During Roll Call, the Shift Supervisor assigns each patrol officer in the shift that they are supervising the duty to patrol a particular sector of the campus by car ("**Car Patrol**"), by bike ("**Bike Patrol**"), or on foot ("**Foot Patrol**").

19.    During the past two years (hereinafter the "**Relevant Time Period**"), on the Last Shift, the role of Shift Supervisor was performed primarily by Corporal Crawford and Sergeant James, and on some occasions by Lieutenant Russel Moody ("**Shift Supervisors**").

20.    It is a standard practice in all police departments, including Temple Police, that when a patrol officers receives communication that another officer has encountered a dangerous situation, and that patrol officers is in his/her vicinity, the patrol officer will proceed to the endangered police officer in order to lend his/her support.  ("**Back-Up**").

21.    Temple Police patrol officers are required to keep a daily log of his/or her activities during their shift ("**Daily Logs**").

22.    Temple University Police General Order 41.8 IV A 1 ("**General Order 41.8**") requires the Shift Supervisor to meet daily with every patrol officer on duty and review and sign his/her daily log book.

23. The Daily Logs are collected at the end of every shift.

24.     In actual practice, the Daily Logs are not read by the Shift Supervisors and prior to August of 2015 were not signed by Shift Supervisors on a consistent basis. (A copy of General Order 41.8 is attached as **Exhibit "B"**)

25.     Officer Shaw had been a member of the Temple Police since 2003 and Officer LaCourt had been a member of the Temple Police since 2010.

26.     Both Officer Shaw and Officer LaCourt were patrol officers in the Last Shift until their termination.

27.     Last Shift Caucasian police officers and their Shift Supervisors participated in a conspiracy to racially discriminate against and segregate African American and Hispanic ("Minority") Last Shift patrol officers (the **"Segregation Conspiracy"**).

28. The Segregation Conspiracy manifested itself in the following manner:

a.     At the daily Roll Call, the Shift Supervisors assigned only Caucasian patrol officers to Car Patrol and assigned Minority patrol officers to Bike Patrol or Foot Patrol except for Officer Leroy Wimberly who has been permanently assigned to patrol the Norris Housing Project at 11th and Warnock Streets by car for the past 5 years.   A Minority patrol officer was rarely assigned to a Car Patrol if a Caucasian officer was available.

b.     Occasionally a newly hired Caucasian police officer would be initially assigned to Bike Patrol or Foot Patrol on the Last Shift while that officer waited for a position to open on another shift or for Car Patrol on the Last Shift.  When such an opening occurred, the newly hired Caucasian police officer would then be re-assigned.

c.     When a Caucasian patrol officer was absent and a temporary replacement was needed for Car Patrol, the Last Shift Supervisors assigned only the Caucasian police

officers present at Roll Call that day (usually patrol officer Flanner) to Car Patrol with another Caucasian police officer.

      d.     Shift Supervisors did not assign Minority patrol officers to work in close physical proximity to Caucasian patrol officers.

      e.     In the Last Shift:

          1)     Newly hired Minority patrol officers who had not received bike training were assigned to patrol alone in worn down automobiles until they completed required bike training.

          2)     As soon as bike training was complete, the Minority patrol officers were assigned exclusively to Bike Patrol or Foot Patrol

          3)     Newly hired Caucasian patrol officers in similar circumstances were assigned to patrol in cars with more experienced Caucasian Patrol Officers who provided them with instruction and training in patrolling in cars.

      f.     The Last Shift Caucasian patrol officers furthered the Segregation Conspiracy by agreeing, amongst themselves, with the tacit approval of their Supervisors, not to Back-Up the Minority patrol officers on Bike Patrol or Foot Patrol in potentially dangerous situations.

      g.     In furtherance, effectuation and continuation of the Segregation Conspiracy, Caucasian patrol officers during the Relevant Period on the Last Shift did not Backup Minority patrol officers, making the work of the Minority patrol officers more dangerous and stressful.

h.     Officer Busam, a Caucasian patrol officer on the Last Shift, used aggressive and abusive and derogatory language when dealing with Minority patrol officers and encouraged other Caucasian patrol officers to do likewise.

29.     All aspects of the Segregation Conspiracy described above were known by the Supervising Officers, who either knowingly participated in the Segregation, watched in silence while these racially discriminatory actions occurred and condoned the actions by their silence, and/or refused to take corrective action when informed of the facts of the Segregation Conspiracy.

30.     Temple University Patrol officers on Bike Patrol and Foot Patrol are required to patrol their assigned sectors alone.

31.     During the Relevant Period, on First Shift and Second Shift, the police officers on Bike Patrol and Foot Patrol received Back-Up from the police officers in cars.

32.     During the Relevant Period, the police officers on Bike Patrol and Foot Patrol in the Last Shift did not receive Back-Up from Caucasian Officers patrolling in cars, notwithstanding the degree of difficulty or the danger being encountered by the Minority Officer.

33.     In an attempt to mitigate the increased danger of patrolling at night alone on foot or on bike, without Back-Up, the Last Shift Minority patrol officers decided to work in pairs for increased safety. ("**Partnering**").

34.     Partnering was less effective than Back-Up by patrol officers in cars, because cars usually arrive at the scene more quickly and the cars create a shelter (zone of safety) for patrol officers encountering danger.

35.     When Partnering, two patrol officers jointly patrolled the two sectors assigned to each patrol officer, which required one of the two patrol officers to be outside of his assigned sector during part of the shift.

36.     When Partnering, each patrol officer was in violation of Section II.D. of the General Order 41.8 which states that in the event a patrol officer must leave his/her assigned area, that officer must notify the Communications Center.  (A copy of General Order 16.6 IV A 1) m is attached hereto as **Exhibit "C"**)

37.     The Last Shift Supervisors knew and accepted that Minority patrol officers on Last Shift were Partnering.

38.     Last Shift Supervisors routinely notified the Dispatcher (Communication Center) which patrol officers were Partnering.

39.     Last Shift patrol officers on Bike Patrol and Foot Patrol would routinely call in to advise the Dispatcher they and their "partner" were taking a lunch break knowing that the Dispatcher had already been advised of the identity of their partner.

40.     In the week of July of 2015, Lieutenant Russell Moody (an African American), texted the patrol officers assigned to Bike Patrol during Last Shift (consisting of all the Minority patrol officers on Last Shift and two Caucasian patrol officer) and asked for a special meeting in the lobby of Weiss Hall away from the Police Headquarters, (the **"Grievance Meeting"**).

41.     The following patrol officers (collectively the **"Attending Officers"**) attended the Grievance Meeting:

      a.   Officer Shaw (African American)

      b.   Officer LaCourt (Hispanic)

      c.   David Alston (African American)

     d.  Hyron Cuthbert (African American)

     e.  Joey Vasquez (Hispanic)

     f.  Michael Davis (Caucasian)

     g.  William Butler (African American)

     h.  Thomas Bullock (Caucasian)

     i.  Russell Moody (African American)

42.     At the Grievance Meeting, the Attending Officers spoke about:

     a.    The unfairness of assigning only Caucasian patrol officers to Car Patrol

     b.    The stigma of inferiority that the division of assignments placed on the Minority patrol officers;

     c.    The fact that their patrol duties were made more dangerous and stressful by the refusal of the Caucasian officer on the Last Shift to provide them with Back-Up.

     d.    The fact that they were afraid to speak out about the Segregation Conspiracy for fear of jeopardizing their jobs.

     e.    At the end of the meeting Lieutenant Moody told the Attending Officers that he would try his best to look into it.

43.     Lieutenant Moody never reported back to the Attending Officers as a group but in two informal meetings with Officer Shaw, Lieutenant Moody relayed that he had spoken with Captain/Deputy Wilhelm about the meeting but had not heard back from her so his hands were tied.

44.     Shortly after this incident, Lieutenant Moody was disciplined, allegedly for failure to supervise.

45.    After the Grievance Meeting, Temple Police conducted an internal investigation of only the activities of the Attending Officers (the "**2015 Investigation**").

46.    The 2015 Investigation did not include any patrol officers on the Last Shift assigned to Car Patrol or any patrol officers assigned to the First Shift or the Second Shift.

47.    Internal investigations are customarily undertaken in response to a filed Complaint.

48.    None of the Attending Officers were informed of any Complaint having been filed against them and upon information and belief, no filed complaint formed the basis for the 2015 Investigation of the Attending Officers.

49.    Officer Shaw, Officer LaCourt, and the other patrol officers on Bike Patrol and Foot Patrol that attended the Grievance Meeting were contacted individually by their respective union representatives and told that they were scheduled to be interviewed, but were not told that their scheduled interview was about a disciplinary matter affecting each of them.

50.    The 2015 Investigation of the Attending Officers (including Officer Shaw and Officer LaCourt) consisted of:

a.    Reviewing video from motion-activated front door cameras in various Temple University buildings on multiple days following the Grievance Meeting to determine when each of the Attending Officers entered and exited particular buildings;

b.    Determining whether the buildings entered by the Attending Officers were outside of their assigned sectors for that day; and

c.    Reviewing the Daily Logs of the Attending Officers to determine whether:

1)    their entries in their Daily Logs aligned with the video from the door cameras;

2)       and whether the descriptions of their activities while in each building were consistent sufficiently detailed to explain or justify their time in each building.

51.    During the past three (3) years, Temple Police conducted no similar investigation of the whereabouts of patrol officers on Car Patrol in the Last Shift nor was there ever any attempt to coordinate the entries on the Daily Logs of patrol officers on Car Patrol with video of their location despite the following:

a.       Each night after Roll Call, the patrol officers on Car Patrol in the Last Shift gather in front of the Dunkin Donuts at 1420 West Cecil B. Moore Avenue to socialize for about an hour before starting their work. This gathering area is visible on the Temple University video cameras but no Supervising Officer on the Last Shift sought to gather any evidence of patrol officers on Car Patrol violating the Rules of Conduct and being outside of their assigned sectors.

b.       During the last two hours of the Late Shift, multiple patrol officers on Car Patrol gather in the parking lot at 1100 block of Cecil B Moore Street to take advantage of the free WIFI being broadcast from the church on the corner of 12th and Cecil B. Moore Street.

c.       Temple Police assigns one car to patrol each zone. Thus when multiple patrol cars are gathered in a single parking lot, most if not all of the patrol officers in the cars are necessarily outside of their assigned patrol zones.

d.       The Supervising Officers of the Late Shift are aware of this practice because they too often meet-up at this location with the patrol officers on Car Patrol in order to sign the Daily Logs of the patrol officers in cars.

12

e.     No Supervising Officer has sought to gather evidence or mete out discipline to Last Shift patrol officers on Car Patrol for being outside of their assigned patrol areas without proper notification.

52.     The 2015 Investigation was a pretext to search for a means to retaliate against the Attending Officers that spoke out against the Segregation Compact and institutional racism inflicted on the Minority patrol officers on the Last Shift.

53.     As of July of 2015, Officer Shaw had been on the Temple Police Force for 12 years without a single disciplinary incident.

54.     Officer Shaw and union representative Hasan Sabir attended an Investigation Interview on September 2, 2015 (**"2015 Shaw Interview"**) conducted by Captain Woltemate and Captain/Deputy Wilhelm (collectively the **"Investigating Officers"**) at which the following took place:

55.     At the interview, Officer Shaw asked about:

a.   the purpose of the Interview; and

b.   whether any charges were filed against him.

56.     The Investigating Officers made no response to Officer Shaw's questions, but rather, began to question Officer Shaw.

57. Captain Woltemate read from a computer a list of pre-written questions and:

a.     Told Officer Shaw that he was seen on video entering and exiting certain Temple University buildings on certain specific dates at certain specific times; and

b.     Asked Officer Shaw if he recalled what he was doing in the various buildings in question on the specific dates and at the specific times in the question.

c.      Asked Officer Shaw what he wrote in the Daily Log for various time periods on various dates.

d.      The dates in question were between 14 to 26 days prior to the September 2, 2015 date of the Shaw Interview.

e.      When Officer Shaw responded to Captain Woltemate by asking to see the video being referenced by Captain Woltemate he was told that seeing the video was "not permitted".

f.      When Officer Shaw asked to see his Daily Logs for the dates in question he was told that viewing his Daily Log was "not permitted".

g.      As Officer Shaw responded to each question, Captain Woltemate typed into the computer only selected portions of Officer Shaw's answers.

h.      None of Officer Shaw's questions to the Investigating Officers were included in Captain Woltemate's typed record of the interview.

i.      At the end of his interview, Captain Woltemate printed the questions from the computer and the portions of Officer Shaw's responses that Captain Woltemate had typed (**"2015 Shaw Investigation Report"**) and gave it to Officer Shaw. According to the 2015 Shaw Investigation Report, the interview lasted eight (8) minutes. (A copy of the 2015 Shaw Investigation Report is attached as **Exhibit "D"**).

j.      Officer Shaw was requested to sign and acknowledge that the 2015 Shaw Report was true and correct which he did because:

      1)  He was intimidated, and afraid he would lose his job and was trying to be cooperative with the Investigating Officers who were the persons who would be determining whether he would be disciplined;

14

2) The Officers recorded his statement accurately but did not include his complete responses; and

3) Officer Shaw was confused about what it meant for the answers to be "true and correct," i.e., that incomplete answers are not "true and correct."

58.   In 2015 Officer LaCourt had been on the Temple Police Force for 5 years without a single disciplinary incident and in 2013 had been awarded the Charles Howard award, also known among Temple Police patrol officers as "Officer of the Year Award". (A copy of the Howard Award to Office LaCourt is attached as **Exhibit "E"**)

59.   In July of 2015 Officer LaCourt received a telephone call from Captain/Deputy Wilhelm asking him to come into Police Headquarters for an interview because all of the patrol officers assigned to Bike Patrol were being investigated and his was the last interview needed to complete the investigation.

60.   At the time of the telephone call from Captain/Deputy Wilhelm, Officer LaCourt was at home on medical leave recuperating from surgery needed to repair the injury he received on the job.

61.   The 2015 interview of Officer LaCourt ("**2015 LaCourt Interview**") was conducted by the Investigating Officers (Captain Woltemate and Captain/Deputy Wilhelm), and attended by union representative Ama Jones.  The investigation began with Captain Woltemate reading questions from a computer and recording only selected portions of Officer LaCourt's answers.

62.   Shortly after the interview started, Captain/Deputy Wilhelm indicated her disapproval of his Officer LaCourt's responses by making disapproving comments and gestures after each of Officer LaCourt's answers.

15

63.     In response to Captain/Deputy Wilhelm's comments, Officer LaCourt attempted to further explain his responses. With every explanation by Officer LaCourt, Captain/Deputy Wilhelm became more hostile, and contentious attempted to confuse and talk over Officer LaCourt.

64.     At this point, the union representative Officer Ama Jones intervened and requested permission for her and Officer LaCourt to step out of the interview room for a couple of minutes. Outside of the meeting Officer Jones advised Officer LaCourt not to oppose Captain/Deputy Wilhelm but to avoid dispute by saying he didn't remember.

65.     The 2015 LaCourt Interview resumed but Officer LaCourt was now frightened of losing his job. He was still in serious pain from his recent surgery and wanted to return home. He responded to the remaining questions from Captain Woltemate in the manner that he thought would end the interview most quickly so he could leave.

66.     At the end of his interview, Captain Woltemate printed the questions from the computer and the portions of Officer LaCourt's responses that Captain Woltemate had typed (**"2015 LaCourt Investigation Report"**) and gave it to Officer LaCourt and asked that he sign it to signify that it was true and correct.

67.     At the conclusion of the interview, Officer LaCourt was in great pain, didn't want to prolong the 2015 LaCourt Interview or provoke Captain/Deputy Wilhelm's rage further and signed the 2015 LaCourt Report as requested by Captain Woltemate.

68.     After the 2015 Investigating Interviews for all eight (8) Attending Officers were completed, the Attending Officers were each advised by a memorandum that they had violated the same sections of the Temple University Rules of Conduct:  i) Rule D.5 – *Leaving an assigned work area without permission*; and ii) Rule D.9 – Gross Neglect – *intentionally or*

16

*recklessly failing to perform job duties and/or neglecting a specific and/or express directive of a*
*supervisor.* (A copy of Temple University's 2014 Rules of Conduct is attached as **Exhibit "F"**).

69.     The memorandum sent to Officer LaCourt ("**Last Chance Memo**") is, upon
information and belief, substantially the same in content as the memorandums sent to all the
Attending Officers and says that the charges made against the patrol officer carry the penalty of
termination but that the patrol officer was being offered a 3-days suspension and a year's
probation if he agreed to the lesser penalty and also agreed that his penalty was not subject to the
union grievance procedure (A copy of the Last Chance Memo sent to Officer LaCourt is attached
as **Exhibit "G"**).

70.     The Last Chance Memo was a deliberate and improper tactic by Temple Police to
intimidate the Plaintiffs and the other Attending Officers into accepting, without question, the 3-
day suspension penalty.

71.     Temple Police was able to charge all eight (8) Attending Officers with the same
violation because they were all patrol officers on Bike Patrol or Foot Patrol who had Partnered in
order to mitigate the adverse consequences of the Segregation Conspiracy described above and
were all working on a summer night when there were little police activity.

72.     Until after the Plaintiffs and Attending Officers were disciplined in September of
2015, the Supervising Officers on the Last Call rarely made contact with the patrol officers while
on duty and rarely signed their Daily Logs as they were required to do by General Order 41.8
(Exhibit B) resulting in patrol officers having little guidance regarding the amount of detail
required in their written description in their Daily Logs.

73.     The disciplinary charges against the Plaintiffs and Attending Officers were
disingenuous, pretextual, and outrageous because the Segregation Conspiracy, known to and

sanctioned by the Supervising Officers, caused Plaintiffs and Attending Officers to resort to Partnering when the Caucasian patrol officers on the Late Shift participating in the Segregation Conspiracy refused to provide them with Back-Up causing the Plaintiffs and Attending Officers to be in violation of Rule D.5 of the Rules of Conduct.

74.     The disciplinary charges brought against the Plaintiffs and Attending Officers were shockingly outrageous because the Plaintiffs and Attending Officers were singled out for investigation for the sole purpose finding a pretext for retaliation against those patrol officers that organized, attended, and spoke at the Grievance Meeting.

75.     On information and belief, the videos reviewed by the Investigating Officers show Caucasian patrol officer Nicholas Windell engaging in the same behavior as the Plaintiffs and Attending Officers who were disciplined.  Patrol officer Nicholas Windell, a Caucasian patrol officer who had been assigned to Bike Patrol, but had not attended the Grievance Meeting as he was absent that evening, was neither charged nor disciplined.

76.     The charge of Gross Neglect was outrageous and baseless because Temple Police made no allegations of improper acts or refusals to follow directives required to support this charge.

77.     Under the Temple University Rules of Conduct, page 5, once the Attending Officers received a 3-day suspension, any future disciplinary action in the next 12 months, no matter how minor, would be cause for their employee to be terminated. (Temple University Rules of Conduct – Exhibit "E".).

78.     The 3-day suspension would be a black mark on the employment record of each of the Attending Officers that would adversely impact their future careers in law enforcement both at Temple University and any future employment.

79.     The Attending Officers were told by their union representatives that the Investigating Officers wanted to impose different penalties on different Attending Officers (e.g. the Investigating Officers had wanted to terminate Officer LaCourt) and impose lesser discipline on other officers but the union insisted on the same penalty for all Attending Officers and the 3-day suspension and probation was negotiated.

80.     The United States Department of Justice sponsored a Gang Resistance Education and Training Program (G.R.E.A.T.) Program for law enforcement officers, school children and families. G.R.E.A.T. is an evidence-based national and international gang and violence prevention program to prevent youth crime, violence and gang involvement built around school-based and law enforcement officer-instructed classroom curricula. ( https://www.great-online.org/Home/About/What-Is-GREAT).

81.     The GREAT Program provided training to law enforcement officers to enable them to work with children and families in their community to prevent gang violence. Temple Police, and every other police force participating in the GREAT Program, was required to execute a *Law Enforcement Educational Agency Agreement* ("**GREAT Commitment Agreement**"). (A copy of the form of the GREAT Commitment Agreement executed by Temple University is attached as **Exhibit "H"**).

82.     The GREAT Commitment Agreement required Temple University to agree on behalf of its Police Force that it would, *inter alia*: (a) select only the best candidates for assignment to the Great Program, and (b) coordinate scheduling with their GREAT instructor

83.     In June of 2016, Officer LaCourt requested and received permission to represent Temple University in the GREAT Program.

84.     The GREAT Program required Officer LaCourt to spend 20 hours of preparation before attending the first in-person classroom training session in July of 2016.

85.     Officer LaCourt believed that he had to complete the preparation work for the Great Program during his regular tour of duty.

86.     Officer LaCourt flew to Jonesboro, Georgia on Sunday, July 23, 2016 to receive additional classroom training for the GREAT Program and Sergeant James, Officer LaCourt's supervisor, had marked Officer LaCourt's schedule to indicate that he would be in Georgia during that time.

87.     In August of 2016, union representative Officer Sabir telephoned Officer LaCourt to tell him that:

        a.     Officer Shaw was the target of an investigation;

        b.     Officer LaCourt was scheduled for an interview at police headquarters on August 18, 2016.

88.     July 22, 2016 was two days before Officer LaCourt was scheduled to fly to Jonesboro, Georgia for classroom instruction in the G.R.E.A.T. Program and that evening, while on duty in Speakman Hall, Officer LaCourt was also working on completing the requirements for his participation in the G.R.E.A.T Program.

89.     Officer LaCourt then contacted union representative Officer Jones to inquire about the reason for the interview.  Officer Jones responded that she didn't know what was happening but that she would come in early on August 18, 2016 and talk to Officer LaCourt.

90.     On the evening of August 17, 2016, Officer LaCourt reported to work and was surprised to see that neither his name nor Officer Shaw's name was on the work roster for the week and that he was not assigned any duties at Roll Call.  Officer LaCourt asked the Shift

Supervisor that evening, Sergeant James, why there no work assigned to him. Sergeant James told Officer LaCourt that he was terminated and then took possession of Officer LaCourt's badge and gun.

91.     On August 18, 2016, Officer LaCourt met with Officer Jones and told her that he was not going to the Investigation Interview because he had been advised of his termination the night before. Officer Jones urged him to attend the Investigation Interview with her and learn what the Investigating Officers wanted to know.

92.     Captain Woltemate started the interview by telling Officer LaCourt that "it didn't look good for him" and asked him to explain his activities on the evening of July 22, 2016.

93.     Captain Woltemate asked Officer LaCourt about his activities in Speakman Hall on July 22, 2016 and the entries he made in his Daily Log on that evening.

94.     Officer LaCourt stated that he was working on his preparation for the Great Program.

95.     Captain Woltemate asked Officer LaCourt whether he notified a supervisor that he was preparing for the GREAT presentation. Officer LaCourt told Captain Woltemate that Sergeant James was aware that he was leaving in two days to spend a week in Jonesboro Georgia to participate in the GREAT Program training.

96.     Officer LaCourt told Lieutenant Woltemate:

   a.   that he had been specially approved by Temple Police to participate in the
        G.R.E.A.T program run by the United States Justice Program as a
        representative of Temple Police;

   b.   that he was required to do 20 hours of preparation to be ready to participate in
        the GREAT program training; and

21

    c.  he was scheduled to fly to Jonesboro, Georgia on July 24, 2016 for a week to receive initial training.  (A copy the Certificate of Achievement given to Officer LaCourt upon his completion of 50 hours of GREAT training is attached as **Exhibit "I"**).

97.    Temple Police not only knew of Officer LaCourt's participation in the Great Program, but they had signed a Law Enforcement and Education Agency Agreement stating that Temple Police would, "make every effort to allow assigned G.R.E.A.T. instructors to fulfill classroom commitments." (A copy of Officer LaCourt's 2016 Investigation Report is attached as **Exhibit "J"**)

98.    Captain Woltemate called Captain/Deputy Wilhelm into the interview.  She walked in angry and aggressive and in a loud voice said to Officer LaCourt: "We have a lot on you.  What do you want to do?"

99.    Without providing Officer LaCourt with a copy of his Daily Log for July 22, 2016, Captain Woltemate read to Officer LaCourt the entries he allegedly made on the Daily Log and asked whether the entries ready to Officer LaCourt were correct.

100.    Officer LaCourt said that some of the Daily Log for July 22, 2015 entries read to him by Captain Woltemate were incorrect.

101.    Officer Jones told Officer LaCourt that his career would be ruined unless he immediately resigned.  Officer Jones typed up a letter of resignation and Officer LaCourt signed it.

102.    On July 22, 2016, Officer Shaw had responded to a call to Morgan Hall (a residence hall) about a man sleeping in the hallway. When Officer Shaw arrived, he learned that

the man had gone to sleep in front of his own room and when awoken, had entered the room with his own key. Officer Shaw then cleared the call.

103.    The evening of July 23, 2016, Officer Shaw received a radio call to contact Corporal Crawford.

104.    Officer Shaw met Corporal Crawford that same evening and Corporal Crawford requested a memo from Officer Shaw regarding the incident that took place at Morgan Hall on July 22, 2016. Officer Shaw prepared and sent the memo to Corporal Crawford. (A copy of the memo from Officer Shaw to Corporal Crawford is attached as **Exhibit "K"**).

105.    Thereafter, Captain/Deputy Wilhelm texted Officer Shaw with a request that he telephone her. When Officer Shaw returned Captain/Deputy Wilhelm's call, the following conversation took place:

> a.      Captain/Deputy Wilhelm asked Officer Shaw to tell her about the *"matters in the Complaint."* Officer Shaw said he didn't know anything about a Complaint and Captain/Deputy Wilhelm said she was referring to the Complaint filed by Corporal Crawford in connection with Morgan Hall.

> b.      Officer Shaw explained to Captain/Deputy Wilhelm the events that occurred at Morgan Hall on July 22, 2016.

> c.      Captain/Deputy Wilhelm then asked *"Where was LaCourt? I know you were partners that night. I know that because of the report that Corporal Crawford submitted to me."*

> d.      Officer Shaw responded by telling Captain/Deputy Wilhelm that Officer LaCourt did not enter Morgan Hall because he (Officer Shaw) had cleared the call almost as soon as Officer LaCourt arrived at the entrance to Morgan Hall.

     e.     Captain/Deputy Wilhelm then said, "*I wanted to fire him (*Officer LaCourt) *a year ago when all you guys got suspended.*"

106.    Officer Shaw was advised by a union representative that he was scheduled to be interviewed for a disciplinary infraction on August 10, 2016 and that contrary to the usual procedure, Captain/Deputy Wilhelm had submitted Officer Shaw's paperwork and Officer LaCourt's paperwork to Human Resources before conducting the interview.

107.    The customary procedure was to conduct the Investigation Interview first and then submit the package to Human Resources once a determination of wrongdoing had been made. According to the union representative, the submission of Officer Shaw's and Officer LaCourt's paperwork to Human Resources before his interview indicated that Captain/Deputy Wilhelm had already made the decision to terminate Officer Shaw and Officer LaCourt.

108.    The Investigation Interview was attended by Officer Shaw, union representative Hasan Sabir, and the Investigating Officers, Captain Woltemate and Captain/Deputy Wilhelm.

109.    During the interview, neither Captain Woltemate nor Captain/Deputy Wilhelm asked Officer Shaw any questions about the incident in Morgan Hall on July 22, 2016, the subject of the alleged Complaint.

110.    Instead of investigating the incident in Morgan Hall, the Investigating Officer again focused their investigation on videos of Officer Shaw entering and leaving buildings on July 22, 201 and the accuracy of his Daily Log for that same day. (A copy of the 2016 Shaw Investigation Report is attached as **Exhibit "L"**)

111.    During the interview, Officer Shaw asked to see the videos being referenced by the Investigating Officers and his Daily Log for July 22, 2016, the day for which he was being questioned.

112.    Officer Shaw was told that it was "not permitted" for him to view either of the requested items.

113.    Immediately after the interview, the union representative Officer Sabir left the area with Captain/Deputy Wilhelm and asked her what actions she was going to take. Captain/Deputy Wilhelm told Officer Sabir that she was going to terminate Officer Shaw. Officer Shaw overheard this conversation.

114.    Officer Sabir contacted Officer Shaw in the locker room after the interview and confirmed that he had spoken directly to Captain/Deputy Wilhelm and that Captain/Deputy Wilhelm told him that she was resolved to terminate Officer Shaw.

115.    Officer Shaw then received a telephone call from patrol officer David Alston telling him that "*everyone is talking about you being fired when you come back to work from your vacation.*"

116.    Again Officer Shaw called Officer Sabir and asked if there is any truth to the talk that he would be fired when he returned to work.  Officer Sabir again confirmed Shaw's termination and said that he knew Officer Shaw was on the Philadelphia police hiring list and recommended that Shaw resign.

117.    Officer Shaw did not want to resign and asked Officer Sabir – "*Fire me over what?  No one is telling the charges!*".

118.    A couple of days later Officer Shaw called Sergeant James and again asked whether he would be terminated when he returned to work from vacation.  Sergeant James confirmed that Officer Shaw would be terminated and said "*I know you are on the hire list for the City job.  Don't let them fire you – better to resign.  You can use me as a reference for the City job*".

119.    Not knowing what a letter of resignation should contain, Officer Shaw copied a letter of resignation he found on the Internet, printed, signed, and delivered the letter of resignation to Temple Police Headquarters on August 18, 2016.

120.    Two nights later, on August 20, 2016, at Roll Call, Sergeant James told all assembled that it was he, not Corporal Crawford, that filed the report that caused Officer Shaw to be terminated.

121.    Plaintiffs remain unable to obtain employment in another police department or in a similar industry since being terminated by Defendant Temple University.

122.    The Temple Police discriminated against Minority patrol officers in the application of discipline for violations of Temple University's Rules of Conduct and applied more stringent and harsher standards to violations by Minority patrol officers that they applied to violations by Caucasian patrol officers.

123.    Officer Busam, the leader of the Segregation Conspiracy, whose day to day language is filled with racially disparaging remarks, has been charged on at least four occasions with racial or sexual harassment by various Last Shift Minority patrol officers and staff and Temple Police has responded to the charges by either;

        a.      failure to investigate the charges;

        b.      failure to record the charge in Officer Busam's employment record;

        c.      countermanding recommended discipline;

        d.      minimizing the charges by handling them internally rather that than reporting them to Temple University's EOC;

        c.      dispensing discipline that on its surface looked severe but was really so mild, that Officer Busam was able to joke about it on Facebook. (A copy of Officer

Busam's Facebook page that was posted after he received a discipline from Captain/Deputy Wilhelm as a result of a sexual harassment complaint by a Minority patrol officer is attached as **Exhibit** "M"); or

f.       Dismissing the charge for lack of evidence.

124.     Officer Shaw was targeted for termination for rule violations that were committed on a routine basis by Caucasian patrol officers on the Last Shift after he gave a statement to the EOC in support of Officer Jason Santiago's complaint of racial harassment against Officer Busam and after complaining to Captain/Deputy Wilhelm about Officer Busam's public disrespect for a Minority Supervising Officer.

125.     The termination of Officer Shaw was also based on his complaints to Supervising Officers concerning the racially derogatory comments of Officer Busam.

**COUNT I**
**ABRIDGEMENT OF PLAINTIFFS' FIRST AMENDMENT RIGHT**
**TO FREEDOM OF SPEECH**

126.     Plaintiffs re-allege and incorporate by reference each and every preceding paragraph as if set forth at length herein.

127.     The United States Constitution protects Plaintiffs' right to speak out on matters of public concern without fear of retaliation.

128.     The eight Attending Officers, of which Plaintiffs were part, attended the Grievance Meeting with Lieutenant Moody and complained that:

a.       For more than a year, they were subjected to institutionally condoned, consistent, daily, racial discrimination in work assignments; and

b.       For more than two years, the patrol officers in the Late Shift assigned to cars conspired to form a racially motivated Segregation Conspiracy to refuse Back-Up to

Minority patrol officers thereby subjecting the Minority patrol officers to more dangerous daily working conditions than the Caucasian patrol officers assigned to Car Patrol.

129.    The speech uttered by the Attending Officers at the Grievance Meeting, including Plaintiffs, concerned matters of great public interest.

130.    The Supervision Officers knew about the racially discriminatory activities on the Last Shift and either actively participated in such racial discrimination or knowingly ignored, and hence tacitly approved, the racially discriminatory practices.

131.    In retaliation for Plaintiffs' exercise of their right to free speech, Defendants Captain Woltemate and Captain/Deputy Wilhelm imposed 3-day suspensions on each participant at the Grievance Meeting, including the Plaintiffs.

132.    The discipline meted out to Plaintiffs and the other Attending Officers was so severe that should any other single discipline be issued during the ensuing 12 months, no matter how slight, it would be grounds for immediate termination.

133.    The uniform discipline meted out to the Attending Officers was sufficiently harsh to discourage the Attending Officers and other patrol officers in the Temple Police from attempting to speak out on the issues raised at the Grievance Meeting.

134.    The imposition of 3-day disciplinary suspensions on each participant at the Grievance Meeting put the job and future career of Plaintiffs in jeopardy and had a chilling effect on their willingness to exercise their right to ever again speak publicly about these issues.

135.    As a result of Defendants' actions, Plaintiffs suffered humiliation, mental anguish and other emotional and mental harm.

136.    Defendants acted maliciously or wantonly in violating Plaintiffs' rights, thereby entitling Plaintiffs to an award of punitive damages.

**WHEREFORE**, Plaintiffs request this Court enter judgment in their favor and against Defendants for:

(a) Compensatory damages in an amount to be determined at the time of trial;

(b) Punitive damages in an amount to be determined at the time of trial;

(c) Plaintiffs' attorney's fees and costs; and

(d) Such other and further relief as this Court deems just and proper.

**COUNT II**
**VIOLATION OF PLAINTIFFS RIGHTS UNDER THE CIVIL RIGHTS ACT OF 1866**

137.    Plaintiffs re-allege and incorporate by reference each and every preceding paragraph as if set forth at length herein.

138.    Defendants have violated the Civil Rights Act of 1866 by intentionally discriminating against Plaintiffs on basis of their race, ancestry and ethnicity in connection with their employment right.

139.    For the past two years, Defendants consistently and deliberately discriminated against Plaintiffs and all other African American and Hispanic police officers on the Last Shift and in favor of Caucasian police officers, all of whom hold positions of equal rank and have identical job descriptions, by daily assigning more favorable duties to Caucasian police officer and less desirable duties to African American and Hispanic police officers.

140.    Defendants also consistently and deliberately discriminated against Plaintiffs and all other African American and Hispanic police officers on the Last Shift and in favor of Caucasian police officers, by targeting and discriminatorily investigating African American and Hispanic police officers while failing to investigate Caucasian police officer of equal rank.

29

141.    Defendants terminated Officer Shaw for trying to mitigate the increased danger he faced every day as a result of the Segregation Conspiracy.

142.    Officer Shaw's race was a motivating and/or determinative factor in Defendants' decision to terminate Officer Shaw.

143.    Defendants terminated Officer LaCourt for i) trying to mitigate the increased danger he faced every day as a result of the Segregation Conspiracy; and ii) studying during work hours so that he could represent Temple Police at the federally funded GREAT Program to prevent gang violence even though Temple University signed this agreement to permit his participation in the GREAT Program and agreed to allow him to have time to complete his assignments.

144.    Officer LaCourt's race was a motivating and/or determinative factor in Defendants' decision to terminate Officer LaCourt.

145.    Moreover, Plaintiffs were subjected to harassment by Officer Busam who used aggressive and abusive language when dealing with African American and Hispanic patrol officers, including Plaintiffs.  Officer Busam's actions were encouraged by the supervising officers, including Corporal Crawford, Sergeant James, Captain Woltemate and Captain/Deputy Wilhelm, each of whom either watched in silence while this took place or refused to take any corrective action when informed of the problem.

146.    Officer Busam's conduct was motivated by Plaintiffs' race and created a hostile work environment for Plaintiffs.

147.    Plaintiffs did not welcome Officer Busam's conduct and complained of Officer Busam's conduct to their supervising officers.

148.    As a result, Defendants targeted Plaintiffs, along with other African American and Hispanic patrol officers, for investigation, imposed a 3-day suspension on Plaintiffs and terminated Officer Shaw and Officer LaCourt.

149.    Further, Defendants took the above action in retaliation against Plaintiffs for opposing the above described unlawful racial discrimination.

150.    As described above, Defendants intentionally discriminated against Plaintiffs and deprived Plaintiffs of all benefits and privileges of their contractual employment relationship with Temple University, in violation of 42 U.S.C. § 1981.

151.    As a result of Defendants' discrimination in violation of Section 1981, Plaintiffs have been denied employment opportunities providing substantial compensation and benefits, thereby entitling them to injunctive and equitable monetary relief, and have suffered anguish, humiliation, distress, inconvenience and loss of enjoyment of life because of Defendants' actions, thereby entitling them to compensatory damages.

152.    As a result of Defendants' discrimination in violation of Section 1981, Plaintiffs have been denied employment opportunities providing substantial compensation and benefits,

153.    Defendants acted with malice or reckless indifference to Plaintiffs' rights, thereby entitling Plaintiffs to an award of punitive damages.

**WHEREFORE**, Plaintiffs request this Court enter judgment in their favor and against Defendants for:

(a) Injunctive relief in the form of reinstatement;

(b) Compensatory damages in an amount to be determined at the time of trial;

(c) Back-pay in an amount to be determined at the time of trial;

(d) Punitive damages in an amount to be determined at the time of trial;

31

(e) Plaintiffs' attorney's fees and costs; and

(f) Such other and further relief as this Court deems just and proper.

## COUNT III
## VIOLATION OF PLAINTIFFS RIGHT OF EQUAL PROTECTION

154.    Plaintiffs re-allege and incorporate by reference each and every preceding paragraph as if set forth at length herein.

155.    During the Last Shift, the patrol officers are comprised of similarly situated African American, Hispanic and Caucasian patrol officers.

156.    While Caucasian patrol officers were assigned to Car Patrol, African American and Hispanic patrol officers, including Plaintiffs, were assigned to Bike Patrol.

157.    While Caucasian patrol officer received Back-Up from patrol officers in cars, African American and Hispanic patrol officers did not receive Back-Up from patrol officers in cars.

158.    While African American and Hispanic patrol officers, including Plaintiffs, were targeted for investigation based on review of videos and Daily Logs, Caucasian patrol officers were not investigated.

159.    While African American and Hispanic patrol officers, including Plaintiffs, were disciplined for trying to mitigate the increased danger they were in every day as a result of the above described illegal racial conspiracy among police officers by Partnering with other patrol officers on Bike Patrol, Caucasian patrol officers were not disciplined for similar violations of Temple University Rule of Conduct.

160.    While Temple University terminated Officer Shaw and Officer LaCourt in retaliation for their attempts to mitigation the effects of the Segregation Conspiracy, Temple

University continued to employ a Caucasian police officer with a 5-year record of multiple sexual harassment and racial harassment complaints.

161.    There is no compelling interest for assigning all African American and Hispanic patrol officers on the Last Shift, including Plaintiffs, to Bike Patrol and Foot Patrol while assigning Caucasian patrol officers to Car Patrol.

162.    There is no compelling interest for targeting for investigation only African American and Hispanic patrol officers, including Plaintiffs, and Caucasian patrol officers sympathetic to the racial harassment being heaped on the Minority patrol officers in the Last Shift, for violations of Temple University Rules of Conduct.

163.    There is no compelling interest for selectively disciplining only African American and Hispanic patrol officers, including Plaintiffs, for violations of Temple University Rules of Conduct.

164.    There is no compelling interest for terminating or constructively discharging Plaintiffs while refusing to terminate a Caucasian police officer for more egregious and numerous complaints and violations.

165.    Temple University cannot show that its favoring of Caucasian patrol officers was narrowly tailored to achieve any legitimate government interest.

166.    Defendants acted maliciously or wantonly in violating Plaintiffs' rights, thereby entitling Plaintiffs to an award of punitive damages.

167.    Defendants actions have injured Plaintiffs' professional reputations and injured their career opportunities when they were disciplined and treated less favorably than Caucasian patrol officers.

168.     As a result of Defendants' actions, Plaintiffs suffered humiliation, mental anguish and other emotional and mental harm.

**WHEREFORE**, Plaintiffs request this Court enter judgment in their favor and against Defendants for:

(a) Compensatory damages in an amount to be determined at the time of trial;

(b) Punitive damages in an amount to be determined at the time of trial;

(c) Plaintiffs' attorney's fees and costs; and

(d) Such other and further relief as this Court deems just and proper.

<u>COUNT IV</u>
## <u>VIOLATION OF PROCEEDURAL DUE PROCESS OF LAW</u>

169.     Plaintiffs re-allege and incorporate by reference each and every preceding paragraph as if set forth at length herein.

170.     In imposing the 3-day suspensions, Temple University violated Plaintiffs' procedural due process by:

1)       failing to advise Plaintiffs that they were the target of the discipline prior to conducting the investigation interview;

2)       refusing to allow Plaintiffs to see their Daily Log books prior to being questioned about them such that they could adequately respond to questions even though incidents under question took place many weeks prior to the interview;

3)       Refusing to allow Plaintiffs to see the videos such that they could adequately respond to questions even though incidents under question took place many weeks prior to the interview; and

34

4)      Intimidating and threatening Plaintiffs with immediate termination if Plaintiffs did not sign the Investigation Record.

171.   In terminating Officer LaCourt, Temple University violated Officer LaCourt's procedural due process by:

1)      Scheduling an investigation interview and failing to inform Officer LaCourt as to the basis for the investigation;

2)      Removing Officer LaCourt from the work roster before the scheduled investigation interview;

3)      Submitting Officer LaCourt's paperwork to Human Resources before conducting his interview and determining the facts;

4)      After having advised Officer LaCourt that he was being terminated, manipulating and inducing Officer LaCourt into resigning upon Sergeant James' promise to be a positive reference for Officer LaCourt, when Sergeant James never intended to make such a reference.

172.   In terminating Officer Shaw, Temple University violated Officer Shaw's procedural due process by:

1)      Removing Officer Shaw from the work roster before his scheduled investigation interview;

2)      Submitting Officer Shaw's paperwork to Human Resources before conducting his interview and determining the facts;

3)      Refusing to allow Officer Shaw to review the Daily Log book and videos in question so that he could adequately respond to questions regarding the incidents in question;

35

4)      After having advised Plaintiff Shaw that he was being terminated, manipulating and inducing Plaintiff Shaw into resigning upon Sergeant James' promise to be a positive reference for Plaintiff Shaw, when Sergeant James never intended to make such a reference.

173.    Plaintiffs were deprived of their future employment opportunities, business reputations, and future employment prospects when Defendants suspended and then terminated Plaintiffs without procedural due process.

174.    As a result of Defendants' actions, Plaintiffs suffered humiliation, mental anguish and other emotional and mental harm

175.    Defendants acted maliciously or wantonly in violating Plaintiffs' rights, thereby entitling Plaintiffs to an award of punitive damages.

**WHEREFORE**, Plaintiffs request this Court enter judgment in their favor and against Defendants for:

(a) Compensatory damages in an amount to be determined at the time of trial;

(b) Punitive damages in an amount to be determined at the time of trial;

(c) Plaintiffs' attorney's fees and costs; and

(d) Such other and further relief as this Court deems just and proper.


## COUNT V
## DEPRIVATION OF PLAINTIFFS' RIGHTS OF
## SUBSTANTIVE DUE PROCESS OF LAW

176.    Plaintiffs re-allege and incorporate by reference each and every preceding paragraph as if set forth at length herein

36

177.    Plaintiffs were deprived of their future employment opportunities, business reputations, and future employment prospects when Defendants

a.      Regularly, and as a matter of course, assigned all African American and Hispanic police officers to Bike Patrol while assigning only Caucasian police officers to the more prestigious and safe Car Patrol;

b.      Accepted, approved and encouraged the racial Segregation Conspiracy amongst the Caucasian police officers not to provide Back-Up to African American and Hispanic police officers on Bike Patrol;

c.      Despite knowledge of the Partnering of African American and Hispanic police officers on Bike Patrol to mitigate the increased dangers imposed by Defendants' discriminatory assignments and the existence of the segregation compact, did not initially object to nor prohibit such Partnering;

d.      Only after the Attending Officers, including Plaintiffs, spoke out about Defendants' discriminatory assignments and the existence of the Segregation Conspiracy deliberately and maliciously concocted the technical violation of the Temple University Code of Conduct based on the Bike Patrol officers' mitigating measures;

e.      Targeted only the Attending Officers who spoke out about Defendants' discriminatory assignments and the existence of a racial Segregation Conspiracy for investigation for the technical violation of the Temple University Code of Conduct;

f.      Imposed a 3-day suspension upon all such Attending Officers in retaliation for their attending the Grievance Meeting;

g.      Disciplining the one supervising officer that gave ear to the Attending Officers' complaints regarding Defendants' discriminatory practices; and

37

h. Ultimately terminating Plaintiffs based on technical violation of the

Temple University Code of Conduct that were necessitated in the first instance by

Defendants' discriminatory assignments and racial Segregation Conspiracy.

i. Contrived to manipulate Plaintiffs into resigning by:

a. having Sergeant Charles James tell Plaintiffs that he would be a

"reference" for the Plaintiffs if the resigned when he had no

intention to do so; and

178. Such actions by the Defendants are an abuse of power that shocks the conscience.

179. As a result of Defendants' actions, Plaintiffs suffered humiliation, mental anguish and other emotional and mental harm

180. Defendants acted maliciously or wantonly in violating Plaintiffs' rights, thereby entitling Plaintiffs to an award of punitive damages.

**WHEREFORE**, Plaintiffs request this Court enter judgment in their favor and against Defendants for:

(a) Compensatory damages in an amount to be determined at the time of trial;

(b) Punitive damages in an amount to be determined at the time of trial;

(c) Plaintiffs' attorney's fees and costs; and

(d) Such other and further relief as this Court deems just and proper.

Respectfully submitted,

Dated: October 25, 2016

Alan S. Fellheimer, Esquire
Atty. I.D. No. 9842
Judith Fellheimer, Esquire
Atty I.D. No. 17732
50 S. 16th Street, Suite 3401
Philadelphia, PA 19102
(215) 253-6630
Attorneys for Plaintiffs