**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

| | | |
|---|---|---|
| **AARON SHAW, <u>ET</u> <u>AL.</u>,** | : | **CIVIL ACTION** |
| | : | |
| *Plaintiffs*, | : | |
| | : | |
| **v.** | : | **No. 16-cv-5567** |
| | : | |
| **TEMPLE UNIVERSITY, <u>ET</u> <u>AL.</u>,** | : | |
| | : | |
| *Defendants*. | : | |

---

**Goldberg, J.**                                                                                    **January 11, 2019**

<u>**Memorandum Opinion**</u>

Plaintiffs, Aaron Shaw and Robert LaCourt, have brought this civil rights action against Defendants, Temple University, and five members of the Temple Police: Captain Denise Wilhelm, Captain Edward Woltemate, Sergeant Charles James, Corporal Brian Crawford, and Patrol Officer Justin Busam.  Plaintiffs have alleged that Defendants engaged in purposeful discrimination and conducted a pretextual disciplinary investigation that ultimately resulted in Plaintiffs' forced resignations.  These allegations are predicated on a 2015 internal investigation, wherein Plaintiffs and six other officers were identified as spending excessive amounts of time inside campus buildings, rather than patrolling the Temple campus, as they were required to do.

All Defendants have moved for summary judgment.  For the reasons stated below, I will grant the Motions for Summary Judgment on all claims, with the exception of the Motion for Summary Judgment filed by Defendants Temple University, Wilhelm, and Woltemate as to Plaintiffs' Procedural Due Process Claim (Count Four).

# I. PROCEDURAL BACKGROUND

Plaintiffs filed their Complaint against multiple Defendants on October 25, 2016. Setting out each of these claims is necessary to understand the bases for my analysis. The claims brought against Defendant Busam are as follows:

- Violation of Plaintiffs' First Amendment Rights (Count One);

- Violation of Title VII by creating a hostile work environment through his use of aggressive and abusive language against Plaintiffs and other minorities, and by retaliating against Plaintiffs by initiating disciplinary action against Plaintiffs after they attended a "Grievance Meeting." (Count Two);

- Violation of Plaintiffs' equal protection rights under the Fourteenth Amendment (Count Three);

- Violation of Plaintiffs' Substantive Due Process Rights (Count Four);

- Violation of Plaintiffs' Procedural Due Process Rights (Count Five).

Additionally, Plaintiffs have brought the following claims against Defendants, Temple University, Wilhelm, Woltermate, James, and Crawford (collectively, the "Temple Defendants"):

- Violation of Plaintiffs' First Amendment Rights by taking retaliatory action against Plaintiffs because Plaintiffs participated in the same Grievance Meeting mentioned above (Count One);

- Violation of Title VII by creating a hostile work environment, retaliating against Plaintiffs by initiating disciplinary action against Plaintiffs after they attended the "Grievance Meeting," and intentional discrimination by assigning more favorable jobs to Caucasian officers and discriminatorily investigating minority police officers while failing to investigate Defendant Busam (Count Two);

- Violation of Plaintiffs' equal protection rights under the Fourteenth Amendment, where the Temple Defendants failed to discipline Defendant Busam and failed to respond to an officer's email that stated his belief that Temple was perpetuating systemic racism (Count Three);

- Violation of Plaintiffs' Substantive Due Process Rights by depriving them of their ability to "pursue a calling." (Count Four); and

– Violation of Plaintiffs' Procedural Due Process Rights by failing to provide meaningful notice and an opportunity to be heard in the pre-termination hearings (Count Five).

## II.   FACTUAL BACKGROUND

Plaintiffs have gone to great lengths to identify "genuine" disputed facts. However, careful examination of these purported disputed facts reflects that most of the "disputes" raised by Plaintiffs are either taken out of context, inaccurate, or conclusory in nature.[1]  My review of the record reflects that the following facts are undisputed, unless otherwise noted.

### A.   The Parties

Plaintiff Shaw is an African American male who worked for the Temple University Police Department as a bike patrol officer from 2003 to August 2016. (Shaw Dep. 8/11/17 at 19:20–20:5, 66:12–69:14, 133:23–134:2, ECF No. 77-10, 79-2, 83-6.)  Plaintiff LaCourt is a Puerto Rican male

---

[1]     By way of example, in support of their motion, the Temple Defendants note that "[d]uring the probationary term, in direct violation of Temple University's Rules of Conduct, Plaintiffs were again found to be spending excessive amounts of time in campus buildings." (Temple Defs.' Statement of Undisputed Facts ¶ 5, ECF No. 80-1.)  In an attempt to rebut these facts, Plaintiffs state: "Denied.  The documents cited in this paragraph speak for themselves.  It is denied that the August 2016 'interviews' of Shaw and LaCourt referred to in this paragraph were the basis for any determination of 'violation' referenced in this paragraph." (Pls.' Resp. Temple Defs.' Statement Undisputed Facts ¶ 5, ECF No. 83-1.)  Yet, as will be detailed infra, it is undisputed that Plaintiffs acknowledged that they were spending excessive amounts of time in campus buildings. (Shaw Dep. 8/11/17 at 352:18–20, ECF No. 80-2; LaCourt Dep. 8/28/17 at 353:13–18, ECF No. 80-3; Shaw Interview 8/10/16, ECF No. 80-10; LaCourt Interview 8/17/16, ECF No. 80-11; Report of Sergeant James, ECF No. 80-9.)

By way of further example, and in support of their position that Plaintiffs were not discriminatorily assigned to bike patrol, the Temple Defendant note that: "Officers on bike patrol can ask to come off patrol at any time." (Temple Defs.' Statement of Undisputed Facts ¶ 17, ECF No. 80-1.)  In response, Plaintiffs state: "Denied as stated. The portion of the deposition cited in this paragraph speaks for itself.  David Alston (AA) ('Alston') testified that any 'request' to 'come off bike' patrol was subject to supervisory approval" (Pls.' Resp. Temple Defs.' Statement Undisputed Facts ¶ 17, ECF No. 83-1.)   Plaintiffs' response does not refute the Temple Defendants' statement of facts, and it remains undisputed that the bike patrollers could request to be removed from patrol. (Alston Dep. 12/15/17 at 35:5–11, ECF No. 83-20.)

who worked for Temple University Police Department from 2010 to August 2016, also as a bike patrol officer. (LaCourt Dep. 8/28/17 at 29:2-7, 34:13-18, 63:22-24, 106:20-107:7, 117:20-21, ECF No. 77-7, 79-3, 83-7.) During their employment, Plaintiffs were members of the International Security, Police, and Fire Professionals of America Union and its Amalgamated Local 511 Union (the "Union"). (Id. at 34:8–10, Shaw Dep. at 74:24–75:9.)

Defendant Temple University is a private state-related university, which supervises and controls its Department of Campus Safety Services (the "Temple Police"). (Compl. ¶ 3, ECF No. 1.) The Temple Police provides 24-hour safety and security services to Temple University's campuses. (Id. ¶ 12.) Defendants Denise Wilhelm and Edward Woltemate were employed by the Temple Police as captains during the events in question. (Id. ¶¶ 4–5.) Defendant Charles James was employed by the Temple Police as a sergeant during the events in question. (Id. ¶ 6.) Defendant Brian Crawford was employed by the Temple Police as a corporal during the events in question. (Id. ¶ 7.) Defendant Justin Busam was employed by the Temple Police as a patrol officer during the events in question. (Id. ¶ 8.)

The Temple Police use the following hierarchical structure: the highest position is executive director, followed by deputy director, captain, sergeant, corporal, and ending with patrol officer. (Id. ¶ 14.) Plaintiffs and Defendant Busam were patrol officers of equal rank during the alleged events. (LaCourt Dep. at 322:24–223:2.)

**B. Shift Assignments**

The Temple Police Officers work in one of three shifts, wherein the Shift Supervisor assigns each patrol officer to a particular sector of campus to be patrolled by car, bike, or on foot. (Id. ¶¶ 14–18.) Lieutenant Russell Moody, who is not a defendant, is an African American male and was the Shift Supervisor who determined Plaintiffs' shift assignments. (Moody Dep. 8/1/17

at 204:22–207:19, ECF No. 77-6, 79-28, 83-8; Wilhelm Dep. 7/18/17 at 15:7–18, 60:21–24, 223:11–22, ECF No. 77-8, 79-26, 79-27, 83-9.)  Defendant James, Defendant Crawford, and Corporal Francisco Gonzalez (not a defendant) would sometimes alter Lieutenant Moody's assignments based on the demands of the day.  (Moody Dep. at 24:4–8; James Dep. 7/17/17 at 184:12–22, ECF No. 80-31, 83-30; Crawford Dep. 7/19/17 at 8:23–9:5, 11:10–24, ECF No. 80-51, 83-27; Alston Dep. 12/15/17 at 19:13–23:8, ECF No. 77-13, 79-29, 83-20; Santiago Dep. 8/29/17 at 57:11-60:9, ECF No. 83-22.)

### C. The Grievance Meeting

In July of 2015, Lieutenant Moody sent a text message to the bike patrol officers assigned to the night shift, requesting an informal meeting in the lobby of a Temple University building that was separate from the Police Headquarters (the "Grievance Meeting").  (Compl. ¶ 40.)  The Grievance Meeting was not initiated on behalf of the Union or Temple University.  Plaintiffs attended the Grievance Meeting with six other officers; the group was comprised of African American, Caucasian, and Latino individuals.  (Id. ¶ 41.)  Defendant Wilhelm was informed of the Grievance Meeting on November 9, 2015.  (Wilhelm Dep. at 211:13–212:11; Moody Dep. at 106:12–21; LaCourt Dep. at 243:5–22.)

In the Complaint and Response in Opposition to Summary Judgment, Plaintiffs complain about racial discrimination and Defendant Busam's racial slurs.  Yet, the undisputed facts of record reflect that during the Grievance Meeting, the officers did not discuss or allege anything about a "segregation conspiracy," racially-motivated assignments, or a "stigma of inferiority" on minority officers.  (LaCourt Dep. at 130:18–131:2, 206:5–18, 131:4–7, 206:19–207:15.)  Rather, Plaintiffs and the other officers complained about officer safety concerns, back-up issues, assignment changes, and the "unfair treatment in the rotation of vehicles."  (Id. at 25:7–14, 214:5–215:11.)

While the officers did express their dislike for Busam, none contended during the Grievance Meeting that he was racist.[2] (Id. at 74:2−11, 85:11−87:7, 202:17−24.)

### D. The 2015 Investigations

Sometime in late July 2015, after the Grievance Meeting, Defendant Busam complained to Defendant Wilhelm that some officers were spending extended or excessive periods of time in campus buildings and not properly performing their police duties. (Wilhelm Dep. at 23:12−26:24.) Upon receiving the complaint, Wilhelm initiated an investigation with Defendant Woltemate by requesting that Detective Haworth (also not a defendant) review the surveillance video of the campus buildings. (Wilhelm Dep. 46:7−23; Woltemate Dep. 7/19/17 at 23:9−11, ECF No. 80-32; Haworth Dep. 8/18/17 at 26:22−28:24, 50:20−51:18, ECF No. 80-33, 83-30.) Detective Haworth's review of the campus buildings was not directed toward any particular officer. (Id.) The investigation revealed that Plaintiffs and six other officers had been spending excessive periods of time in buildings during their shifts, in violation of the employment policies. (Woltemate Dep. at 26:20−27:24; Haworth Dep. at 7:10−11, 20:12−22:18, 23:9−11; Wilhelm Dep. at 54:16−55:15, 63:14−23, 69:10−70:6, 96:16−97:1, 121:4−122:2.) The group of eight officers identified in the investigation was comprised of Hispanic, African American, and Caucasian individuals. (Id.)

Based on the findings of the investigation, Defendants Wilhelm and Woltemate facilitated an interview with each of the eight officers, wherein each officer, including Plaintiffs, were

---

[2] The record does provide several examples of third parties hearing Busam use racial slurs and the "n-word." (Alaya Dep. 69:6−71:2, Aug. 24, 2017; Alston Dep. 28:16−31:16, Dec. 12, 2017.) However, Plaintiff Shaw testified that he personally overheard Busam using a racial slur against someone else only one time. (Shaw Dep. 235:11−236:3.) Plaintiff LaCourt similarly testified that Busam used a racial slur in his presence one time when he called another officer "an f'ing Puerto Rican." (LaCourt Dep. 324:15−325:14.)

interviewed about the excessive time spent inside campus buildings during their patrols. Plaintiff Shaw's interview was conducted on September 2, 2015 and Plaintiff LaCourt's interview was conducted on September 17, 2015. (Shaw Tr. 9/2/15, ECF No. 80-35, 83-10, 83-11; LaCourt Tr. 9/17/15, ECF No. 80-36, 83-11.) During each interview, Wilhelm and Woltemate asked essentially the same questions of all the officers, and provided them with the opportunity to explain why they were spending excessive time in the buildings. (Id.) Notice of Plaintiffs' offenses was provided during the interview and each Plaintiff was represented by a Union Representative during the interviews. (Shaw Dep. at 248:2−250:21; Shaw Tr. 9/2/15; LaCourt Dep. at 228:10−24, 230:20−231:18; Jones Dep. 12/16/18 at 12:12−24, ECF No. 80-44, 83-15.)

Neither Plaintiff was shown the surveillance footage during their interviews. (Wilhelm Dep. at 70:7−13; Woltemate Dep. at 85:23−87:2.) It is important to note here that Plaintiff LaCourt did not request to see the surveillance footage during the interview. (LaCourt Dep. at 355:17−356:4; Wilhelm Dep. at 70:7−13; Woltemate Dep. at 85:23−87:2.) However, it is disputed whether Plaintiff Shaw requested to see the video and patrol logs that Defendants stated were evidence of his violations. (Shaw Dep. at 265:1−10; Sabir Dep. 8/2/17 at 39:7−15, ECF No. 79018, 83-12; Wilhelm Dep. at 70:7−13; Woltemate Dep. at 85:23−87:2.) Defendant Woltemate transcribed the interviews, which were provided to Plaintiffs and their union representatives at the end of the interviews. (Shaw Dep. at 248:2−250:21; LaCourt at 228:19−24, 232:1−6.) After reviewing the transcription, both Plaintiffs signed a statement indicating that they did not dispute being in the buildings during the alleged times. (Shaw Tr. 9/2/15; LaCourt Tr. 9/17/15.)

### E. The Last Chance Agreements

After concluding these interviews, the Union negotiated the same sanctions for Plaintiffs and the other six officers. (Sabir Dep. at 33:13−15; Shaw Dep. at 273:20−275:3, 276:13−20,

320:1–12; Davis Dep. 6/1/18 at 10:18–11:13, 13:18–20, 17:14–22:24, ECF No. 80-49, 83-39; Leone Dep. 12/4/17 at 27:2–23, 31:24–35:24, ECF No. 80-46, 83-14.)  While the officers could have been terminated for their offenses, the Union instead negotiated a three-day suspension, followed by a "probationary" period of one year.  During this probationary period, Plaintiffs agreed that they could be terminated for any violation of the Temple University Rules of Conduct that resulted in a written warning.  In other words, if Plaintiffs violated the Temple University Rules of Conduct, they could be immediately terminated without being able to contest the termination (i.e., a grievance).  This negotiated discipline was memorialized in the "Last Chance Agreements," which was signed by each Plaintiff.  (LaCourt's Last Chance Agreement 3/11/16, ECF No. 80-5; Shaw's Last Chance Agreement 9/30/15, ECF No. 80-6; Davis Dep. at 15:2–16; Shaw Dep. at 277:21–24, 278:1–13.)

On September 29, 2015, Plaintiff Shaw was presented with his Last Chance Agreement in the presence of Union Representative William Lacey.  (Shaw Dep. at 275:4–16; Lacey Dep. 1/12/18 at 21:4–23:24, ECF No. 80-48, 83-40.)  Plaintiff Shaw was provided with the opportunity to discuss the Last Chance Agreement with Lacey, but he did not ask Lacey any questions or raise any objections.  (Lacey Dep. at 35:12–17, 37:20–38:1; Shaw Dep. at 272:19–273:3, 341:18–342:3.)  Plaintiff Shaw signed the Last Chance Agreement, which placed him on probation until October 3, 2016.  (Shaw Dep. at 272:19–273:3, 277:21–24, 341:18–342:3; Lacey Dep. at 21:2–3, 31:19–24.)  As noted above, the Last Chance Agreement stated that any violation of Temple University's Rules of Conduct during the probationary period would "be grounds for termination and will not be grievable."  (Shaw's Last Chance Agreement 9/30/15; Shaw Dep. at 277:21–24, 278:1–13.)

On March 11, 2016, Plaintiff LaCourt was also presented with his Last Chance Agreement in the presence of Union Representative Brent Tillman. (Tillman Dep. 1/12/18 at 5:17−6:4, 9:23−10:9, 18:12−15, ECF No. 80-49, 83-49.) Plaintiff LaCourt was provided with the opportunity to discuss the Last Chance Agreement with Tillman, but he did not ask Tillman any questions or assert any objections. (Id. at 11:17−13:5, 15:22−16:24, 23:20−24, 25:11−17.) Plaintiff LaCourt signed the Last Chance Agreement, which placed him on probation until March 12, 2017. (LaCourt Dep. at 191:23−192:14, 279:8−280:12; Tillman Dep. at 10:5−17:7.) The Last Chance Agreement also stated that any violation of Temple University's Rules of Conduct during the probationary period would "be grounds for termination and will not be grievable." (LaCourt's Last Chance Agreement 3/11/16; LaCourt Dep. at 279:18−280:12.)

### F. The 2016 Violations and Interviews

On July 22, 2016, Plaintiff Shaw received a radio order to respond to an unconscious student in a dorm room, but did not respond until thirty minutes after receiving the call because he was on a shift break. (Shaw Dep. at 332:14−22, 349:1−351:23.) Shaw never informed dispatch that he was on break, even though he was required to do so. (Id.; Crawford Dep. at 143:2−144:24.) Given the severity of the situation, Defendant Crawford, acting as the supervisor on duty, reported the incident to his supervisor, Defendant James. (James Dep. at 60:10−61:15; Crawford Dep. 144:9−13.) Defendant James reviewed the available security footage to determine why Plaintiff Shaw failed to respond to the call. (James Dep. at 71:7−72:24, 99:10−100:19.) During this review, Defendant James discovered that both Plaintiffs had been in a University building for an excessive amount of time when they should have been patrolling. (James Dep. at 72:7−10.) Defendant James informed his supervisor, Defendant Wilhelm, of the incident in a memorandum. (Id.;

Wilhelm Dep. at 163:21−164:3.)  Defendant Wilhelm investigated the incident by obtaining the audio logs, patrol logs, video footage, and incident report.  (Wilhelm Dep. at 164:16−24.)

Based on Defendant Wilhelm's investigation, Defendants Wilhelm and Woltemate conducted interviews, wherein they asked Plaintiffs about the incident in the presence of their Union Representatives.  (Shaw Dep. at 346:21−347:4, Sabir Dep. at 15:2−22:16; LaCourt Dep. at 65:16−66:1, 70:6−16.)  Both Plaintiffs admitted to being in a University building during the alleged time when they should have been patrolling.  (Shaw 2016 Interview, ECF No. 80-20; LaCourt 2016 Interview, ECF No. 80-21; Shaw Dep. 345:13−346:20; LaCourt Dep. 77:18−78:20.) Defendant Woltemate transcribed the questions and responses.  (Woltemate Dep. at 74:23−76:21.) After the interviews, Plaintiffs were given the opportunity to discuss the transcriptions with their Union Representatives and signed the transcription without voicing any disagreements or objections.  (Shaw Dep. at 345:13−346:20; Sabir Dep. at 21:19−22; LaCourt Dep. at 77:18−80:18, 95:15−96:3.)

Plaintiff Shaw's conduct on July 22, 2016 relating to the failure to respond to a radio call, spending excessive time in buildings, and failing to record time in or out on the time logs violated the Temple University Rules of Conduct.  (Temple University Code of Conduct, ECF No. 80-24.) Likewise, Plaintiff LaCourt's excessive time spent in buildings violated the Temple University Rules of Conduct.  (Id.)  On July 22, 2016, both Plaintiffs were still working under their one-year probationary period.  (Shaw's Last Chance Agreement 9/30/15;  LaCourt's Last Chance Agreement 3/11/16.)  Because this conduct violated the Temple University Rules of Conduct and occurred within the probationary period, Plaintiffs violated their Last Chance Agreements.  (Id.) Both Plaintiffs resigned based upon the Union Representative's advice that they would be

terminated. (LaCourt Dep. at 76:3–6; Shaw Dep. at 87:17–89:3; Shaw's Resignation Letter 8/18/16, ECF No. 77-2, 79-23; LaCourt's Resignation Letter 8/18/16, ECF No. 77-4, 79-23.)

## III.  LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A dispute is "genuine" if there is a sufficient evidentiary basis on which a reasonable fact finder could return a verdict for the non-moving party, and a factual dispute is "material" if it might affect the outcome of the case under governing law. Kaucher v. Cnty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The court must view the evidence in the light most favorable to the non-moving party. Galena v. Leone, 638 F.3d 186, 196 (3d Cir. 2011). However, "unsupported assertions, conclusory allegations or mere suspicions" are insufficient to overcome a motion for summary judgment. Schaar v. Lehigh Valley Health Servs., Inc., 732 F. Supp. 2d 490, 493 (E.D. Pa. 2010) (citing Williams v. Borough of W. Chester, Pa., 891 F.2d 458, 461 (3d Cir. 1989)).

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial Celotex burden can be met by showing that the non-moving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case." Id. at 322.

After the moving party has met its initial burden, summary judgment is appropriate if the non-moving party fails to rebut the moving party's claim by "citing to particular parts of materials

in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" that show a genuine issue of material fact or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." FED. R. CIV. P. 56(c)(1)(A).

## IV. DISCUSSION AND ANALYSIS

### A. Claims Against Defendant Busam

Plaintiffs allege that Defendant Busam, who was a co-worker and also employed as a patrol officer for the Temple Police, intentionally discriminated against them on the basis of race. Specifically, Plaintiffs allege that Defendant Busam cultivated a discriminatory and hostile work environment, which resulted in the disparate treatment and the pretextual discipline and termination of Plaintiffs.

#### 1. Section 1983 Claims (Counts One, Three, Four, and Five)

Defendant Busam moves for summary judgment as to the First Amendment Claim (Count One), Equal Protection Claim (Count Two), Substantive Due Process Claim (Count Four), and Procedural Due Process Claim (Count Five), arguing that he cannot be liable under § 1983 because he had no actual or de facto supervisory authority over Plaintiffs. Plaintiffs respond that Defendant Busam had de facto supervisory authority, or in the alternative, is liable under "cat's paw" theory of liability.[3]

---

[3] Plaintiffs assert that Defendant Busam is liable under the "cat's paw theory" of liability. This theory of liability "addresses the circumstances under which an employer may be held liable for employment discrimination based on the discriminatory animus of an employee who influenced, but did not make, the ultimate employment decision." Jones v. SEPTA, No. 12-CV-6582-WY, 2014 WL 3887747, at *11 (E.D. Pa. Aug. 7, 2014), aff'd sub nom., 796 F.3d 323 (3d Cir. 2015) (emphasis added). Plaintiffs confuse this theory of liability which is inapplicable here because Defendant Busam is not Plaintiffs' employer.

To state a claim under 42 U.S.C. § 1983, a plaintiff must establish that the defendants "exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." Livingston v. Borough of Edgewood, 430 F. App'x 172, 178 (3d Cir. 2011) (quoting Bonenberger v. Plymouth Twp., 132 F.3d 20, 23 (3d Cir. 1997). "If a state entity places an official in the position of supervising a lesser-ranking employee and empowers him or her to give orders which the subordinate may not disobey without fear of formal reprisal, that official wields sufficient authority to satisfy the color of law requirement of 42 U.S.C. § 1983 . . . We therefore look to substance rather than form in determining whether an individual defendant possesses supervisory authority." Bonenberger, 132 F.3d at 24–25 (reversing the district court's grant of summary judgment where the police sergeant had direct power to give orders to plaintiff during her work shift, altered her workload, and could initiate a disciplinary process against plaintiff upon disobedience). "The two primary factors the Court examine[s] to determine whether there [is] de facto supervisory control [are] 1) whether the defendant could alter the plaintiff's workload, and 2) whether the plaintiff would face charges of insubordination for failure to obey the defendant's order." Zelinski v. Pennsylvania State Police, 108 F. App'x 700, 703 (3d Cir. 2004); Yarnall v. Philadelphia Sch. Dist., 57 F. Supp. 3d 410, 428 (E.D. Pa. 2014) (finding that there was no de facto supervision where the defendant was a co-worker, member of the same union, had no authority over the paintiff or other teachers, and could not "discipline, observe, evaluate, or terminate Plaintiffs").

Plaintiffs allege that there are sufficient facts to establish that Busam exercised de facto supervisory authority over them because he: instigated a formalized investigation of Plaintiffs; used his "clout" to direct African American officers to sit in the back of the patrol car; made physical and sexual threats of violence against minority officers; flaunted his being "protected"

status, such that he felt no compunction about publicly thanking Temple University on social media for a "vacation" during "suspension;" and due to Defendant Wilhelm's efforts to shield Defendant Busam's identity in the 2015 investigation. (Pl.'s Resp. Defs.' Mot. Summ. J. at 20–24.)

Except for the allegation that Defendant Busam instigated a formalized investigation of Plaintiffs, these facts have absolutely nothing to do with Defendant Busam's supervisory authority over Plaintiffs. See, e.g., Zelinski v. Pennsylvania State Police, 108 F. App'x 700, 703 (3d Cir. 2004) ("The two primary factors the Court examined to determine whether there was de facto supervisory control were 1) whether the defendant could alter the plaintiff's workload, and 2) whether the plaintiff would face charges of insubordination for failure to obey the defendant's order.").

Rather, I conclude that the undisputed facts show that Defendant Busam did not exercise de facto authority over Plaintiffs' workloads. The record reflects that Officer Moody made the shift assignments and James, Crawford, and Gonzalez adjusted these assignments according to the demands of the day. (James Dep. at 184:12–22; Crawford Dep. at 8:23–9:5, 11:10–24.) While Officers Alston and Santiago speculated that Defendants James and Crawford switched assignments based on their friendship with Defendant Busam, speculation is not enough to overcome summary judgment. (Alston Dep. at 22:9–23:8; Santiago Dep. at 57:11-60:9.) Moreover, Plaintiffs cannot establish that Defendant Busam's alleged report to Defendant Wilhelm rises to the level of "initiating a disciplinary process," given that it was up to Wilhelm as supervisor to decide whether or not to investigate. In fact, the undisputed facts reflect that it was only after Wilhelm broadly investigated the allegations that a disciplinary process was initiated. (Wilhelm Dep. at 46:7–23; Woltemate Dep. at 23:9–11; Haworth Dep. at 26:22–28:24, 50:20–51:18.)

Accordingly, Defendant Busam's Motion for Summary Judgment as to the First Amendment Claim (Count One), Equal Protection Claim (Count Two), Substantive Due Process Claim (Count Four), and Procedural Due Process Claim (Count Five) will be granted.

## 2. Section 1981 Claims (Count Four)

Plaintiffs also allege that Defendant Busam created a hostile work environment through his aggressive and abusive language against Plaintiffs and other minorities and that he retaliated against Plaintiffs using his de facto supervisory authority to initiate the investigation against Plaintiffs. Defendant Busam responds that Plaintiffs' hostile work environment claim is not supported because there is insufficient evidence to establish "extreme and pervasive conduct." Defendant Busam further argues that Plaintiffs cannot establish a retaliation claim against him because he had no supervisory authority over Plaintiffs.

The United States Court of Appeals for the Third Circuit has found individual liability under § 1981 "when [the defendants] intentionally cause an infringement of rights protected by Section 1981, regardless of whether the [employer] may also be held liable." See Cardenas v. Massey, 269 F.3d 251, 268 (3d Cir. 2001) (quoting Al-Khazraji v. Saint Francis Coll., 784 F.2d 505, 518 (3d Cir. 1986) (alteration in original)). "In order to establish a prima facie hostile work environment claim under § 1981, a plaintiff must show: '(1) the employee suffered intentional discrimination because of [his race], (2) the discrimination was pervasive and regular, (3) the discrimination detrimentally affected the plaintiff, (4) the discrimination would detrimentally affect a reasonable person of the same [race] in that position, and (5) the existence of respondeat superior liability.'" Woodard v. PHB Die Casting, 255 F. App'x 608, 609 (3d Cir. 2007) (quoting Weston v. Pennsylvania, 251 F.3d 420, 426 (3d Cir. 2001)). "The discriminatory conduct must be so extreme as to amount to a change in the terms and conditions of employment. Unless they are

extremely severe, offhand comments and isolated incidents are insufficient to sustain a hostile work environment claim." Woodard v. PHB Die Casting, 255 F. App'x 608, 609 (3d Cir. 2007) (quoting Caver v. City of Trenton, 420 F.3d 243, 262 (3d Cir. 2005)).

Plaintiffs have not pointed to sufficient undisputed facts to establish that Defendant Busam's conduct was "severe and pervasive." Rather, the undisputed facts show that Defendant Busam's use of racial slurs in front of Plaintiffs was isolated and limited. Plaintiff Shaw testified that he personally overheard Defendant Busam using a racial slur against someone else only one time. (Shaw Dep. at 235:11−236:3.) Plaintiff LaCourt similarly stated that Defendant Busam used a racial slur in his presence one time when he called another officer (Acosta) "an f'ing Puerto Rican." (LaCourt Dep. at 324:15−325:14.) Thus, while Plaintiffs describe several incidents wherein Defendant Busam uses racial and misogynistic language against minority co-workers, Plaintiffs can each only point to one instance where they individually overheard Busam using a racial slur.[4]

Plaintiffs rely on Castleberry v. STI Group, 863 F.3d 259, 264 (3d Cir. 2017), urging that Busam's conduct was pervasive and severe. However, Castleberry held that one instance of a supervisor using the n-word was sufficient to plead a hostile work environment claim and survive the Motion to Dismiss. Id. (emphasis added). And again, Defendant Busam was not Plaintiffs' supervisor. Applying the appropriate Motion for Summary Judgment standard, I find that the record before me and the conduct at issue do not rise the level of "severe or pervasive," such that it changed the terms and conditions of Plaintiffs' employment. See, e.g., Woodard v. PHB Die

---

[4] It is true that Plaintiffs provided examples of other third parties hearing Busam use racial slurs and the "n-word." (Alaya Dep. at 69:6−71:2; Alston Dep. at 28:16−31:16; Shaw Dep. at 228:9−231:22.) But, these additional third-party incidents do not, as a matter of law, amount to "severe and pervasive" conduct.

Casting, 255 F. App'x 608, 609–10 (3d Cir. 2007) (affirming the grant of the defendant's summary judgment where the plaintiff alleged that he was given less favorable job assignments than Caucasian co-workers, his employer did not remove KKK-related graffiti in the bathroom for three months, and his co-workers made racially charged comments to him); Caver v. City of Trenton, 420 F.3d 243, 263 (3d Cir. 2005) ("[C]omments referring to other individuals that were merely overheard by [plaintiff] are the sorts of 'offhanded comments and isolated incidents' that the Supreme Court in Faragher, 524 U.S. at 788, cautioned should not be considered severe or pervasive enough to constitute a hostile work environment."); see also Tourtellotte v. Eli Lilly & Co., 636 F. App'x 831, 847–48 (3d Cir. 2016) (summary judgment affirmed where the court considered evidence of discriminatory conduct towards employees other than the plaintiff, but clarified that the plaintiff must demonstrate "how conduct directed towards others impacted them in satisfaction of their own prima facie case").

Accordingly, Defendant Busam's Motion for Summary Judgment as to the § 1981 Claim (Count Two) will be granted.

## B. Claims Against the Temple Defendants

Plaintiffs have alleged that the Temple Defendants intentionally discriminated against them on the basis of race. Specifically, Plaintiffs have averred that the Temple Defendants permitted a perpetuation of a discriminatory and segregated workplace environment, which resulted in disparate treatment, and Plaintiffs' pretextual discipline and termination because of their involvement in a Grievance Meeting.

### 1. First Amendment Violation (Count One)

The Temple Defendants first move for summary judgment as to the First Amendment Claim (Count One), arguing that Plaintiffs cannot show a causal connection between the allegedly

retaliatory action and the protected activity. Plaintiffs respond that Defendant Wilhelm initiated the investigation (i.e., the retaliatory action) because of Plaintiffs' participation in the Grievance Meeting.

"The elements of a retaliation claim under 42 U.S.C. § 1983 predicated on the First Amendment and under the Rehabilitation Act are the same. In both cases plaintiffs must show (1) that they engaged in a protected activity, (2) that defendants' retaliatory action was sufficient to deter a person of ordinary firmness from exercising his or her rights, and (3) that there was a causal connection between the protected activity and the retaliatory action. Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007). "To establish the requisite causal connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." Lauren, 480 at 267. A plaintiff must first show that the defendant had knowledge of the protected activity to show that such activity was "a substantial or motivating factor" in his disciplinary action. Ambrose v. Twp. of Robinson, 303 F.3d 488, 493–94 (3d Cir. 2002).

Plaintiffs allege that Defendant Wilhelm retaliated against them for participating in the Grievance Meeting by initiating the disciplinary actions against them. It is true that Defendant Wilhelm was the individual who initiated the disciplinary actions against Plaintiffs. (Wilhelm Dep. at 46:7–23; Woltemate Dep. at 23:9–11; Haworth Dep. at 26:22–28:24, 50:20–51:18.) But, the undisputed facts establish that Defendant Wilhelm found out about the Grievance Meeting on November 9, 2015, which was almost three months after the August 2015 disciplinary investigations had occurred. (Wilhelm Dep. at 211:13–212:11; Moody Dep. at 106:12–21; Leone Dep. at 120:23–122:15; E-mail 11/9/15, ECF No. 80-54.)

When Plaintiff LaCourt was questioned about Wilhelm's knowledge of the Grievance Meeting, he stated that he did not have any evidence that Wilhelm knew about this meeting:

> Q: How is it that Ms. Wilhelm –
> Are you saying that Ms. Wilhelm retaliated against you because of the meeting?
> A: Yes.
> Q: How is it that Ms. Wilhelm retaliated against you because of the meeting
> when you have no information that she ever
> knew about the meeting?
> . . .
> A: I don't know if she
> don't have no information.
> Q: Well, do you have any information?
> A: That she knows?
> Q: Yes.
> . . .
> A: No.  (LaCourt Dep. at 243:5–22.)

Plaintiff LaCourt further admitted that he did not tell Defendants James, Crawford, Busam, or Woltemate about the Grievance Meeting.  (LaCourt Dep. at 208:6–209:24.)  Plaintiff Shaw has similarly failed to refute the fact that Wilhelm learned of the Grievance Meeting in November of 2015.

Given the record before me, Plaintiffs have failed to establish the necessary causal link because Defendant Wilhelm, the supervisor with the authority to take disciplinary action, initiated the investigation in question three months before she knew about the Grievance Meeting. Consequently, the Temple Defendants' Motion for Summary Judgment as to the First Amendment Right claim (Count One) will be granted.

### 2. Violation of the Civil Rights Act (Count Two)

Plaintiffs have alleged four § 1983 claims against the Temple Defendants.  First, Plaintiffs have alleged a hostile work environment claim, asserting that the Temple Defendants permitted the allegedly ongoing and pervasive harassment by Defendant Busam.  Second, Plaintiffs have alleged an employment discrimination claim against the Temple Defendants, arguing that the

discipline was pretextual. Third, Plaintiffs argue that the discipline was "tainted" under the "cat's paw" theory of liability because Defendant Busam harbored animus against Plaintiffs. Fourth, Plaintiffs have alleged a retaliation claim, contending that Defendant Wilhelm initiated the investigation (i.e., the retaliatory action) because of Plaintiffs' participation in the Grievance Meeting.

### a. Hostile Work Environment

Plaintiffs' hostile work environment claim contends that the Temple Defendants permitted ongoing and pervasive harassment by Defendant Busam. The Temple Defendants respond that this claim is not supported because there is insufficient evidence to establish "extreme and pervasive conduct."

"A hostile work environment claim under Section 1981 is analyzed in the same manner as under Title VII. To succeed on a hostile work environment claim, a plaintiff must prove: (1) she suffered intentional discrimination on the basis of race; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) the discrimination would have detrimentally affected a reasonable person in like circumstances; and (5) there is a basis for employer liability, such as respondeat superior." Miller v. Thomas Jefferson Univ. Hosp., 908 F. Supp. 2d 639, 653 (E.D. Pa. 2012), aff'd, 565 F. App'x 88 (3d Cir. 2014) (quoting Kunin v. Sears Roebuck & Co., 175 F.3d 289, 293 (3d Cir. 1999)). "The basis for an employer's liability for hostile environment [racial] harassment depends on whether the harasser is the victim's supervisor or merely a co-worker. When a harasser is a co-worker or other non-supervisor, employer liability attaches 'only if the employer failed to provide a reasonable avenue for complaint, or, alternatively, if the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action. An employer's remedial action is adequate if it is reasonably

calculated to prevent further harassment.'" Id. (quoting Huston v. Procter & Gamble Paper Prod. Corp., 568 F.3d 100, 110 (3d Cir. 2009)).

Plaintiffs attempt to defeat summary judgment by arguing that the Temple Defendants permitted the "pervasive" harassment by Busam and the assignment of more favorable duties to Caucasian police officers. But, as explained supra, Plaintiffs cannot establish that they were victims of Busam's "pervasive and severe" discrimination. Further, Plaintiffs cannot establish that the alleged discriminatory shift assignments rise to the level of a hostile work environment where the shift assignments were determined by Moody, an African American officer. (Moody Dep. at 204:22–207:19; Wilhelm Dep. at 25:5–11, 60:21–24, 223:11–22.) The record further indicates that James, Crawford, and Gonzalez would change Moody's assignments based on the demands of the day. (James Dep. at 184:12–22; Crawford Dep. at 8:23–9:5, 11:10–24.) Plaintiffs' reliance on the speculation of Officers Alston and Santiago that Defendants James and Crawford changed the assignments because of their friendship with Busam does not rise to the requisite level of discrimination. (Alston Dep. at 19:13–23:8; Santiago Dep. at 57:11-60:9.) Given the record before me, Plaintiffs have not established a hostile workplace claim.

### b. Employment Discrimination

Second, Plaintiffs have brought an employment discrimination claim, alleging that the Temple Defendants shielded Busam and that the 2015 discipline was pretextual. The Temple Defendants respond that Plaintiffs have failed to establish a prima facie case of discrimination.

The Third Circuit evaluates employment discrimination using the burden-shifting framework set forth in McDonnell Douglas, 411 U.S. 792, 802–05 (1973). Under this framework, the plaintiff has "the initial burden" of establishing a prima facie case of racial discrimination. In re Tribune Media Co., 902 F.3d 384, 401–02 (3d Cir. 2018). To establish a prima facie case, the

plaintiff must show that: "(1) he belongs to a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action despite his qualifications; and (4) the action occurred under circumstances that raise an inference of discriminatory action." Oguejiofor v. Bank of Tokyo Mitsubishi UFJ Ltd, 704 F. App'x 164, 167 (3d Cir. 2017) (citing Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797 (3d Cir. 2003)). Once the plaintiff has established a prima facie case, the burden shifts to the defendant to "offer evidence of a legitimate, non[-]discriminatory reason for the [adverse employment] action." Id. (quoting Connors v. Chrysler Fin. Corp., 160 F.3d 971, 974 n.2 (3d Cir. 1998) (alteration in original)).

If a defendant can offer such evidence, the burden shifts back to the plaintiff to show that "the employer's explanation is pretextual." Id. (quoting Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994)). "To establish pretext under the summary judgment standard, a plaintiff must either (1) offer evidence that 'casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication,' or (2) present evidence sufficient to support an inference that 'discrimination was more likely than not a motivating or determinative cause of the adverse employment action.'" Farzan v. Vanguard Grp., Inc., 582 F. App'x 105, 107 (3d Cir. 2014) (quoting Perskie, 32 F.3d at 762).

Based on the record before me, and for several reasons, Plaintiffs have not established the elements of a prima facie claim of intentional discrimination. First, neither Wilhelm nor Woltemate identified any officers by name when conducting the general surveillance review during the 2015 investigation. (Wilhelm Dep. at 46:7–23; Woltemate Dep. at 23:9–11.) Second, Detective Haworth's review of the campus buildings was not directed toward any particular officer. (Haworth Dep. at 26:22–28:24, 50:20–51:18.) Once the investigation was complete, a group of eight officers was identified as spending excess time in the buildings, which was

comprised of African American, Caucasian, and Hispanic officers. These eight officers were all investigated and interviewed in the same manner. (Woltemate Dep. at 26:20–27:24; Haworth Dep. at 7:10–11, 20:12–22:18, 23:9–11; Wilhelm Dep. at 54:16–55:15, 63:14–23, 69:10–70:6, 96:16–97:1, 121:4–122:2.) Third, after the investigation and interviews, all eight officers received the same discipline that was negotiated by the Union. (Sabir Dep. at 33:13–15; Shaw Dep. at 273:20–275:3, 276:13–20, 320:1–12; Shaw Dep. at 273:20–275:3, 276:13–20, 320:1–12; Davis Dep. at 10:18–11:13, 13:18–20, 17:14–22:24; Leone Dep. at 27:2–23, 31:24–35:24.) Lastly, and most importantly, Plaintiffs do not refute that their conduct violated the University's Policies and Last Chance Agreements, which explicitly provided for their termination. (Shaw's Last Chance Agreement 9/30/15; LaCourt's Last Chance Agreement 3/11/16.) This fact precludes Plaintiffs from establishing that the alleged adverse action raises an inference of discrimination.

Inexplicably, Plaintiffs also argue that the Temple Defendants intentionally discriminated against them by failing to investigate Defendant Busam for more egregious behavior. But, Plaintiffs have not explained how this fact, even if proven, establishes an intentional discrimination claim. This is especially the case where Defendant Busam was not implicated in the 2015 investigations. See Hanzer v. Mentor Network, 610 F. App'x 121, 125 (3d Cir. 2015) (summary judgment granted where the plaintiff did not establish that the other employers treated differently were "similarly situated" to the plaintiff). Given the record before me, Plaintiffs have not established an intentional discrimination claim.

### c. Plaintiffs' Cat's Paw Theory

Plaintiffs alternatively argue that the Temple Defendants are liable for intentional discrimination under the "cat's paw" theory of liability, which holds an "employer liable for the animus of a nondecisionmaker [employee]." McKenna v. City of Philadelphia, 649 F.3d 171, 177

(3d Cir. 2011).  The Temple Defendants respond that cat's paw liability is inapplicable here where Plaintiffs have not established a prima facie case that the adverse employment action was motivated by Defendant Busam's "animus" against Plaintiffs.

As noted previously, an employer is liable under a "cat's paw" theory of liability "when an employee's 'supervisor performs an act motivated by [discriminatory] animus that is intended by the supervisor to cause an adverse employment action, and . . . is a proximate cause of the ultimate employment action.'"  Jones v. Se. Pa. Transp. Auth., 796 F.3d 323, 330 (3d Cir. 2015) (quoting Staub v. Proctor Hosp., 562 U.S. 411, 422 (2011)).  However, once a plaintiff establishes a prima facie case of such liability, the defendant must present evidence that the termination was due to reasons unrelated to the biased action.  McKenna, 649 F.3d at 178.

Based on the record before me, Plaintiffs' arguments for intentional discrimination under the "cat's paw" theory of liability are unavailing because the reason for the ultimate discipline was the result of an unbiased investigation, wherein Plaintiffs acknowledge that they had violated both Temple's Policy and their Last Chance Agreements.  And, as explained in great detail supra, neither Wilhelm nor Woltemate identified any officers by name when conducting the general surveillance review during the 2015 investigation, and Detective Haworth's review of the buildings was not directed toward any particular officer.  (Wilhelm Dep. at 46:7–23; Woltemate Dep. at 23:9–11, July 19, 2017; Haworth Dep. at 26:22–28:24, 50:20–51:18.)  Once the investigation was complete, a group of eight officers was identified as spending excess time in the buildings, which was comprised of African American, Caucasian, and Hispanic officers.  These eight officers were all investigated and interviewed in the same manner.  (Woltemate Dep. at 26:20–27:24; Haworth Dep. at 7:10–11, 20:12–22:18, 23:9–11; Wilhelm Dep. at 54:16–55:15,

63:14–23, 69:10–70:6, 96:16–97:1, 121:4–122:2.) Accordingly, Plaintiffs have failed to establish an intentional discrimination claim under the "cat's paw" theory of liability.

### d. Retaliation

Plaintiffs have additionally brought a retaliation claim against the Temple Defendants, claiming that the Temple Defendants retaliated against them by failing to investigate Defendant Busam for more egregious behavior. But, Plaintiffs have not explained how this argument relates to a retaliation claim, which requires a plaintiff to establish that "(1) [they] engaged in a protected activity; (2) there was adverse action after or contemporaneous with the protected activity; and (3) a causal link exists between the adverse action and the protected activity." Andreoli v. Gates, 482 F.3d 641, 649 (3d Cir. 2007). "For a causal link, the Third Circuit has found two main factors relevant 'in finding the causal link necessary for retaliation: timing and evidence of ongoing antagonism.'" Miller, 908 F. Supp. 2d at 652 (quoting Abramson v. William Paterson Coll. of New Jersey, 260 F.3d 265, 288 (3d Cir. 2001)). The timing must be "unusually suggestive of retaliatory motive before a causal link will be inferred." Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997).

As explained, infra, the record before me does not provide the necessary causal link because Defendant Wilhelm, the supervisor with the authority to take disciplinary action, initiated the investigation three months before she knew about the Grievance Meeting. Consequently, Plaintiffs have failed to establish a retaliation claim under Title VII.

### 3. Violation of Plaintiffs' Equal Protection Rights (Count Three)

Plaintiffs have also alleged that "[t]here is no doubt that the Temple Defendants acted with deliberate indifference to Plaintiffs' equal protection rights, endlessly subjecting them to a hostile work environment and pretextual, disparate disciplines, and untimely, terminations." (Pls.' Resp.

Defs.' Mot. Summ. J. at 34–35.)  Plaintiffs assert that the Temple Defendants consistently and deliberately discriminated against them by investigating minority police officers, while failing to investigate Busam.    In support of this assertion, Plaintiffs point to an email sent by Union Representative, Hasan Sabir, on September 1, 2016, wherein he stated that he believed that the Temple Administration was "perpetuating systemic racism."

"The <u>sine qua non</u> of any successful Equal Protection claim under § 1983 is purposeful discrimination."  <u>Williams v. Pa. State Police Bureau of Liquor Control Enf't</u>, 108 F. Supp. 2d 460, 271 (E.D. Pa. 2000) (citing <u>Keenan v. City of Phila.</u>, 983 F.2d 459, 465 (3d Cir. 1992)).  "This is what distinguishes § 1983 equal protection claims from Title VII cases; to prevail on a  § 1983 claim, a plaintiff must prove that the defendant intended to discriminate.  <u>Id.</u> (citing <u>Washington v. Davis</u>, 426 U.S. 229, 238–39 (1976)).  "A plaintiff must produce direct or indirect evidence of intent.  However, the threshold of indirect proof for a prima facie case of equal protection violation is higher than in a Title VII case; a § 1983 plaintiff must show disparate impact plus some additional 'indicia of purposeful discrimination.'"  <u>Id.</u> (quoting <u>Pennsylvania v. Flaherty</u>, 983 F.2d 1267, 1273 (3d Cir.1993)).  In order to demonstrate a disparate impact, a plaintiff must show that the compared group is comprised of "similarly situated" individuals, meaning that these individuals "are alike 'in all relevant aspects.'"  <u>Startzell v. City of Phila.</u>, 533 F.3d 183, 203 (3d Cir. 2008) (quoting <u>Nordlinger v. Hahn</u>, 505 U.S. 1, 10 (1992)).  "Conclusory statements [and] general denials ... [are] insufficient to avoid summary judgment."  <u>Chambers ex rel. Chambers v. Sch. Dist. Of Philadelphia Bd. Of Educ.</u>, 587 F.3d 176, 197 (3d Cir. 2009) (quoting <u>Olympic Junior, Inc. v. David Crystal, Inc.</u>, 463 F.2d 1141, 1146 (3d Cir. 1972) (alteration in original)).

Plaintiffs' purposeful discrimination claim against the Temple Defendants rests on the premise that the Temple Defendants failed to investigate Defendant Busam for more egregious

behavior. But, Plaintiffs have not explained how this argument establishes an intentional discrimination claim, which requires them to establish a disparate impact plus some additional evidence that the defendant intended to discriminate. Plaintiffs and the six other officers were investigated and identified by Captain Wilhelm and Captain Woltemate after Detective Haworth conducted a general review of the security footage of the campus buildings, which was not directed toward any particular officer. (Wilhelm Dep. at 46:7–23; Woltemate Dep. at 23:9–11; Haworth Dep. at 26:22–28:24, 50:20–51:18.) Further, Plaintiffs fail to explain why the investigation of Defendant Busam is relevant, given that he was not part of the group of eight officers identified in the investigation. Neither have Plaintiffs presented evidence of the Temple Defendants' intent to discriminate, where the group identified in the investigation was comprised of African American, Caucasian, and Hispanic officers, all of whom were investigated, interviewed, and disciplined in the same manner. (Woltemate Dep. at 26:20–27:24; Haworth Dep. at 7:10–11, 20:12–22:18, 23:9–11; Wilhelm Dep. at 54:16–55:15, 63:14–23, 69:10–70:6, 96:16–97:1, 121:4–122:2; Sabir Dep. at 33:13–15; Shaw Dep. at 273:20–275:3, 276:13–20, 320:1–12; Davis Dep. at 10:18–11:13, 13:18–20, 17:14–22:24; Leone Dep. at 27:2–23, 31:24–35:24.) In light of these undisputed facts, Plaintiffs have failed to establish that Defendant Busam's preferential treatment was based on race, particularly where Defendant Busam was not identified as an offending officer in this investigation.

Plaintiffs' reliance on Union Representative Sabir's September 1, 2016 e-mail, which stated his belief that the Temple Administration was "perpetuating systemic racism," is unavailing. In fact, Sabir testified that he had no facts to substantiate his conclusory statement:

Q: If you could turn to P-85 please. The bottom
half of the page there appears to be an e-mail from you to
Charles Leone dated September 1, 2016. Do you see that?
A: Yes.

27

Q: Can you tell me who Mr. Leone is?
A: He is the Chief of the Police Department.
Q: Is his title Executive Director, do you know?
A: Yes.
Q: Did you send this e-mail to Mr. Leone's attention
on that date and at or about that time?
A: Yes.
Q: What was the purpose in sending that email?
A: To make him aware that there was a perception
of racism in the department.
                              . . .
Q: So in the next sentence, you talk about what your
opinion is. Do you see that?
A: Yes.
Q: You say it's - - the sentence reads, it is my
opinion that you and your administration are perpetuating
systemic racism whether consciously or subconsciously.
If not addressed, the fall out will result in
embarrassment to both the university and the department.
Did I read that correctly?
A: Mm-hmm. Yes.
Q: So what were the facts to form your opinion such
that you would send this e-mail to Executive Director
Leone?
A: I didn't have any facts.  (Sabir Dep. at 44:17–45:6, 47:19–48:5.)

Accordingly, the Temple Defendants' Motion for Summary Judgment as to the Equal Protection

Claims (Count Three) will be granted.

### 4. Procedural Due Process Claim (Count Four)

Plaintiffs have also alleged that the Temple Defendants violated their procedural due

process rights by failing to provide them with the identity of their accuser(s) or complainant(s),

notice of the charges against them, an explanation of the employer's evidence relating to those

charges, or an opportunity to present Plaintiffs' side or defenses to such undisclosed charges and

evidence.  The Temple Defendants also move for summary judgment as to the Procedural Due

Process Claim (Count Four), arguing that the undisputed facts reflect that Plaintiffs were provided

notice and a meaningful opportunity to be heard during the investigation interview hearings, where the union officials represented them.

"[P]laintiffs have cognizable property interests in their positions as police officers that are sufficient to trigger the procedural due process protection of the Fourteenth Amendment." Fraternal Order of Police Lodge No. 5 v. Tucker, 868 F.2d 74, 79 (3d Cir. 1989). "Except in emergency situations not present here, procedural due process requires that when the government seeks to discharge an employee who possess[es] a protected property interest in her job, 'it must afford notice and opportunity for hearing appropriate to the nature of the case before the termination becomes effective.'" Mancini v. Northampton Cty., 836 F.3d 308, 315 (3d Cir. 2016) (quoting Dee v. Borough of Dunmore, 549 F.3d 225, 232 (3d Cir. 2008)).

"The Supreme Court [has] held that '[t]he tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story.'" Taggart v. GMAC Mortg., LLC, 600 F. App'x 859, 863 (3d Cir. 2015) (quoting Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 546 (1985)). "[O]ne essential component of due process [is] a pre[-]termination opportunity to respond." McDaniels v. Flick, 59 F.3d 446, 454 (3d Cir.1995). "Recognizing the limited purpose of pre-termination proceedings, courts have held that due process does not require an employer to provide every piece of evidence relevant to an employee's termination." Ashton v. Whitman, 94 F. App'x 896, 900–01 (3d Cir. 2004). An employer provides sufficient notice "if it apprises the vulnerable party of the nature of the charges and general evidence against him." Gniotek v. City of Phila., 808 F.2d 241, 244 (3d Cir. 1986) (finding that a statement containing a summary of evidence against the plaintiff that he signed provided the plaintiff with sufficient notice).

"Failure to describe the nature of evidence supporting termination violates due process." Jennings-Fowler v. City of Scranton, 680 F. App'x 112, 116 (3d Cir. 2017); Fraternal Order of Police Lodge No. 5 v. Tucker, 868 F.2d 74, 80 (3d Cir. 1989) (holding that, although the discharged police officers were sufficiently informed of disciplinary action against them and given an opportunity to state their objections, they were nevertheless deprived of a "meaningful" pre-termination hearing because "they were not told anything specific about . . . the allegations being investigated or the evidence regarding the allegation").

Plaintiffs first allege that the Temple Defendants denied them procedural due process by failing to provide them with notice of the offense and an opportunity to be heard. The undisputed facts do not support this position. Defendant Wilhelm initiated an investigation, which revealed that Plaintiffs and six other officers had been spending excessive periods of time in buildings during their shifts, in violation of their employment policies. (Woltemate Dep. at 26:20–27:24; Haworth Dep. at 7:10–11, 20:12–22:18, 23:9–11; Wilhelm Dep. at 54:16–55:15, 63:14–23, 69:10–70:6, 96:16–97:1, 121:4–122:2.) Based on the findings of the investigation, Defendants Wilhelm and Woltemate interviewed these eight officers in the same manner. (Id.) Notice of the allegations was provided during the investigation hearing, and both Plaintiffs were represented by a Union Representative during the interviews. (Shaw Dep. at 248:2–250:21; LaCourt Dep. at 228:10–24, 230:20–231:18; Shaw Tr. 9/2/15; LaCourt Tr. 9/17/15.) Accordingly, I find that each Plaintiff was provided with "oral or written notice of the charges against him . . . and an opportunity to present his side of the story." Taggart v. GMAC Mortg., LLC, 600 F. App'x 859, 863 (3d Cir. 2015).

However, Plaintiffs were also entitled to "an explanation of the employer's evidence." Id. The failure to describe the nature of evidence supporting a termination can violate due process.

Jennings-Fowler v. City of Scranton, 680 F. App'x 112, 116 (3d Cir. 2017). The interview transcriptions reflect that Defendants Woltemate and Wilhelm mentioned the "video" and "patrol log" evidence during the interview. (Shaw Investigation Interview 9/2/15, ECF No. 79-35; LaCourt Investigation Interview 9/17/15, ECF No. 79-36.) However, Defendants Woltemate and Wilhelm did not show either Plaintiff this evidence, which, importantly, was the primary basis for the discipline. (Shaw Dep. 264:11–265:16; LaCourt Dep. 232:7–233:12.) And, it is a disputed fact as to whether the video and patrol logs were even available upon request during the interview process. (Wilhelm Dep. 70:11–13, Woltemate Dep. 85:23–87:2, Sabir Dep. 65:4–13; Shaw Dep. at 265:1–1; LaCourt Dep. 355:17–356:4.) Moreover, there are facts of record, which, if accepted, could establish that Plaintiff Shaw actually requested to see the video and patrol logs that were evidence of his violations. (Shaw Dep. at 265:1–10; Sabir Dep. at 39:7–15; Wilhelm Dep. at 70:7–13; Woltemate Dep. at 85:23–87:2.)[5]

The Temple Defendants rely upon a non-binding case, Bond v. City of Bethlehem, No. CIV.A. 10-6739, 2011 WL 5119576, at *2 (E.D. Pa. Oct. 27, 2011), to argue that Plaintiffs Shaw and LaCourt received due process. Bond v. City of Bethlehem, No. CIV.A. 10-6739, 2011 WL 5119576, at *2 (E.D. Pa. Oct. 27, 2011), aff'd, 505 F. App'x 163 (3d Cir. 2012). In Bond, the plaintiff was suspended for sending harassing text messages to a co-worker, stalking her, and violating multiple Protection from Abuse Orders. The plaintiff admitted that he sent the harassing text message and that the messages "were designed to annoy and alarm and frighten her." Id.

---

[5] It is undisputed that LaCourt did not request to see this evidence. (LaCourt Dep. 355:17–356:4.) However, both Plaintiffs were entitled to an explanation of the evidence, whether or not it was requested. Jennings-Fowler v. City of Scranton, 680 F. App'x 112, 116 (3d Cir. 2017).

I find that the facts of <u>Bond</u> are distinguishable from the facts before me. In <u>Bond</u>, the plaintiff was apprised of the employer's evidence in the pre-termination hearing, which consisted of text messages that had been created and sent by the plaintiff. Further, the plaintiff admitted that he had sent these text messages in order to harass the receiver. <u>Id.</u> at *2, *7. In contrast, the evidence here is a security video of the events in question that Plaintiffs had never viewed. While the plaintiff in <u>Bond</u> asserted a due process claim for not receiving a pre-termination hearing, he did not challenge due process on the basis of a lack of explanation of the evidence. Here, Plaintiffs Shaw and LaCourt have averred that they were denied due process because they were not provided with an explanation of the evidence, and, as described above, there are disputed material facts as to whether the evidence was even available at the meeting.

The video and patrol logs were the primary focus of the investigations. Because a genuine issue of material fact exists as to whether this evidence should have been provided, I find that Plaintiffs may proceed with their procedural due process claim (Count Four). However, because Defendants Crawford and James were not part of the investigatory hearings, I will grant their Motion for Summary Judgment as to this claim.

### 5. Substantive Due Process Claim (Count Four)

Plaintiffs have alleged that their termination constituted a due process violation. The Temple Defendants move for summary judgment as to the Substantive Due Process Claim (Count Five) because Plaintiffs have not established a protected liberty interest. Plaintiffs respond that they have a liberty interest in pursuing a calling or occupation, which was deprived by the Temple Defendants' actions.

"To establish a substantive due process claim, a plaintiff must prove the particular interest at issue is protected by the substantive due process clause and the government's deprivation of that

protected interest shocks the conscience." Chainey v. Street, et al.., 523 F.3d 200, 219 (3d Cir. 2008). The Third Circuit has recognized that "the liberty to pursue a calling or occupation . . . is secured by the Fourteenth Amendment." Thomas v. Indep. Twp., 463 F.3d 285, 297 (3d Cir. 2006). However, this liberty interest is not the right to a specific job. Id. Thus, plaintiffs must allege an inability to obtain employment within the field, not just a particular job or at a specific location or facility. See, e.g., Latessa v. N.J. Racing Comm'n, 113 F.3d 1313, 1317–18 (3d Cir. 1997); Culinary Serv. of Delaware Valley, Inc. v. Borough of Yardley, Pa, 385 F. App'x 135, 141 (3d Cir. 2010).

Plaintiffs claim that the Temple "Defendants actions collectively converged, to deprive Plaintiffs of their opportunity to serve and protect the public (including students) around Temple." However, Plaintiffs fail to point to any facts pertaining to the inability to obtain employment within the field. Accordingly, the Temple Defendants' Motion for Summary Judgment as to the Substantive Due Process Claims (Count Five) will be granted.

## V. CONCLUSION

For the foregoing reasons, I conclude that Defendant Busam's Motion for Summary Judgment should be granted, and the Temple Defendants' Motion for Summary Judgment should be granted as to Counts One, Two, Three, and Five. Defendants Crawford and James' Motion for Summary Judgment as to Plaintiffs' Procedural Due Process Claim (Count Four) will also be granted. Defendants Temple University, Wilhelm, and Woltemate's Motion for Summary Judgment as to Plaintiffs' Procedural Due Process Claim (Count Four) will be denied.

An appropriate Order follows.